Nancy L. PORTER, Plaintiff,

v.

Shirley S. CHATER,[1] Commissioner of Social Security, Defendant.

Civ. A. No. 93–1293–FGT.

United States District Court, D. Kansas.

July 7, 1995.

**1.** Pursuant to P.L. No. 103–296, the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security effective March 31, 1995. In accordance with section 106(d) of P.L. 103–296,

Shirley S. Chater, Commissioner of Social Security, is substituted for Donna E. Shalala, Secretary of Health and Human Services, as the defendant in this action. Nevertheless, the body of this opinion refers to actions by the Secretary, who had jurisdiction at all times relevant to this case.

**1428**

Donna J. Long, Vernon, Retter & Long, Concordia, KS, for plaintiff.

Stephen K. Lester, Office of U.S. Atty., Wichita, KS, for defendant.

### *MEMORANDUM AND ORDER*

THEIS, District Judge.

This is an action to review the final decision of the Secretary of Health and Human Services denying disability benefits to the plaintiff. This matter comes before the court on the plaintiff's motion for summary judg-

ment (Doc. 5) and the Secretary's motion to affirm (Doc. 6).[2]

Plaintiff first filed an application for disability benefits under Title II of the Social Security Act on August 24, 1988 (Tr. 165–67), alleging that she had been disabled since November 30, 1987. Plaintiff's claim reached the hearing level and was denied by an administrative law judge (ALJ) on August 23, 1989. Tr. 266–73. Plaintiff did not appeal.

Plaintiff filed a second application for disability benefits under Title II on October 20, 1989 (Tr. 275–76), again alleging that she had been disabled since November 30, 1987. The application was denied at the initial consideration and reconsideration levels. Tr. 290–92, 304–05. On December 27, 1990, following a hearing, an ALJ rendered a decision (Tr. 446–56) in which he found that the plaintiff was not under a "disability" as defined in the Social Security Act at any time when she met the earnings requirement of the Act. (Plaintiff last met the earnings requirement on December 31, 1990). On November 25, 1991, the Appeals Council of the Social Security Administration remanded the case to an ALJ to conduct a new hearing and issue a new decision. The sole reason for reversal was a problem with the tape recording of the hearing. The Appeals Council was unable to listen to the tape and thus could not determine if substantial evidence supported the ALJ's decision. Tr. 465–67. However, a transcript of this hearing was subsequently prepared and is included in the administrative record before the court.

On July 24, 1992, following a new hearing, an ALJ issued a decision finding plaintiff not disabled at any time she met the earnings requirement of the Act. Tr. 17–27. The Appeals Council considered additional evidence (Tr. 8–13), and on June 15, 1993 denied the plaintiff's request for review. Tr. 4–5. Thus, the decision of the ALJ stands as the final decision of the Secretary.

Plaintiff was born on February 11, 1948. In her application dated October 20, 1989, plaintiff alleged that she became disabled on November 30, 1987. Tr. 275. Her alleged impairments included irritable bowel syndrome, familial hypercholesterolemia, fibromyalgia, chronic depressive neuroses, and chronic fatigue. Tr. 310. She has a high school education and some florist training. Tr. 314. Plaintiff has worked as a loan processor/collection officer, bank teller, head teller, computer operator, secretary, self-employed housecleaner, and self-employed florist. Tr. 318. Plaintiff has not engaged in substantial gainful activity since November 30, 1987, the alleged onset date of her disability. Plaintiff's insured status expired on December 31, 1990.

Plaintiff has suffered from a variety of physical impairments, including fibromyalgia, irritable bowel syndrome, depression, and chest pain but no coronary artery disease. From her brief, it appears that plaintiff's main complaints are pain and a mental impairment.

Gregory D. Schnose, M.D., is plaintiff's primary care physician. Treatment notes from an August 18, 1986 office visit to Dr. Schnose indicate that plaintiff was inquiring about whether she would qualify for disability based on back discomfort. Tr. 435. Notes from an August 22, 1986 office visit to Dr. Mary Ann Hoffman, M.D., an orthopedic specialist, reflect that plaintiff was contemplating filing for Social Security disability benefits. Tr. 231. Dr. Hoffman recom-

---

**2.** The parties have followed D.Kan.Rule 503, which provides for the filing of "an appropriate dispositive motion and memorandum" for a social security appeal. The Tenth Circuit, in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 n. 29, 1580 (10th Cir.1994), disapproved of the motion practice followed in this district pursuant to D.Kan.Rule 503 and explicitly prohibited the continued use of this procedure. The court is in the process of amending D.Kan.Rule 503 to comply with the holding in *Olenhouse* and to conform with the provisions of Fed.R.App.P. 15.

The court attaches no legal significance to the titles the lawyers have given their filings. Instead, the court looks to the substance of the documents, which does comply in every material way with the requirements of the Social Security Act and the Federal Rules. As it has always done, the court intends to follow the well-established standard of review for social security appeals and to rely only on the evidence found within the administrative record.

mended that plaintiff take three Advil tablets three times a day for her pain. Tr. 231.

On February 20, 1988, plaintiff was admitted to Lawrence Memorial Hospital suffering from chest pain. Dr. Schnose's notes indicate that plaintiff has had a lot of trouble with back pain and was seeing a chiropractor. Tr. 425. Plaintiff was resistant to remaining in the hospital, resistant to taking medications, and refused to undergo a cardiac catheterization. Tr. 425–27. Plaintiff was released the next day with a diagnosis of chest pain, etiology undetermined. Tr. 427.

Treatment notes from March 22, 1988 reflect that plaintiff was getting chiropractic treatments for muscle tightness and back pain. Tr. 429. Treatment notes from June 14, 1988 reflect that Dr. Schnose was unsure whether plaintiff's chest pain was anginal or musculoskeletal. His notes reflect that plaintiff had seen a rheumatologist in Topeka and that all lab work and x-rays were normal. Plaintiff reported having been to 39 chiropractic treatments recently. Tr. 432.

Treatment notes from August 8, 1988 indicate plaintiff was seen by Dr. Schnose for her back pain. Muscle relaxants and physical therapy were prescribed. Dr. Schnose indicated that plaintiff was worried about obtaining disability benefits. He indicated that obtaining disability would be difficult under the present set of symptoms. Tr. 433.

In August and September 1988, plaintiff was seen by William A. Bailey, M.D., an orthopedic surgeon. Dr. Bailey prescribed physical therapy and a muscle relaxant. Plaintiff reported that the physical therapy was not helpful. Dr. Bailey's treatment notes indicate that he did not know what was causing her musculoskeletal problems and that he did not think any treatment he had to offer would help her significantly. Tr. 245–46.

On August 23, 1988 the plaintiff reported to Dr. Schnose that the physical therapy prescribed by Dr. Bailey made her back worse. Tr. 433. Treatment notes from November 2, 1988 reflect that Dr. Schnose suggested plaintiff think about entering a work hardening program. Tr. 407.

On May 3, 1989, plaintiff reported that her back was generally better. Tr. 405. On June 20, 1989, Dr. Schnose encouraged plaintiff to remain active and continue walking and noted that there was no real change in her back. Tr. 404.

In a letter dated October 13, 1989, Dr. Schnose stated that the plaintiff's most disabling problem was her chronic back and muscle pain. Dr. Schnose stated that plaintiff had had several evaluations by orthopedic surgeons and rheumatologists and that the diagnosis at that point was fibromyalgia and fibrositis. Plaintiff had undergone various therapies which had all been less than satisfactory. Tr. 361. In both this letter and a letter dated December 22, 1989, Dr. Schnose stated that because of her chronic pain, he believed that she would be unable to tolerate full time work in areas where she had the training and qualifications to be employable. Tr. 359–60; 361. Dr. Schnose stated that plaintiff could potentially tolerate part-time work if the job allowed sufficient breaks, change in body position, and rest. Tr. 360. Dr. Schnose indicated that plaintiff's pain has been consistently severe since 1986. Treatments have included anti-inflammatory medication, antidepressants, physical therapy and chiropractic treatments. Plaintiff was presently participating in an exercise program. Tr. 361.

Plaintiff has seen chiropractor Craig Wright on a number of occasions. Treatment notes from the time period January 9, 1990 through October 1, 1990 reflect a total of thirty-four (34) treatment visits. Tr. 378–82.

In a questionnaire dated October 2, 1990, Dr. Schnose indicated that plaintiff should be able to occasionally lift up to ten pounds with no frequent lifting; stand or walk four to six hours in an eight hour day; stand or walk for one to two hours without interruption; sit for four hours in an eight hour day; and sit for one half to one hour without interruption. Tr. 387–88.

In a questionnaire dated October 3, 1990, Dr. Wright indicated that plaintiff should be able to frequently lift four to five pounds; stand or walk one and one half hours in an eight hour day; stand or walk for 20 to 25

minutes without interruption; sit for four hours in an eight hour day; and sit for 45 to 55 minutes without interruption. Tr. 375–76.

In a letter dated March 8, 1991, Dr. Schnose provided clarification regarding his assessments. He noted that his assessments were fairly consistent with Dr. Wright's assessments, except for plaintiff's ability to stand. Dr. Schnose had commented that plaintiff could stand or walk for one to two hours without interruption and up to four to six hours per day. Dr. Schnose stated, "On medical evaluation I did not find physical evidence that would preclude her from being up for several hours at a time. She continues to have similar subjective and soft findings on examination as in the past and I do not believe these have substantially changed. On the other hand, to be fair and impartial to Ms. Porter's complaints, she does get the majority of her back care from Dr. Wright and historically has not been in my office during the worst of her exacerbations." Tr. 441.

Office notes from a March 4, 1991 office visit to Dr. Schnose indicate "We had a long discussion about her work ability which I think indeed is limited because of her discomfort and need for very special consideration and change of position frequently, although she is not likely full disabled I appreciate her difficulty in maintaining any reasonable work activities because of her discomfort and special needs." Tr. 444.

Robert H. Blum, Ph.D., evaluated plaintiff in September 1989. Tr. 351–58. Dr. R. Blum diagnosed plaintiff as suffering from dysthymia or chronic depressive neurosis that deepens on occasion into major depressive episodes. Tr. 358. Dr. R. Blum noted a series of stresses and life crises which have caused episodic major depression. He continued that "[f]inally, we now also see the fibromyalgia producing the latest life crisis— a slowly building but debilitating one that creates a daily, almost minute to minute psychological stressor." Tr. 358. He opined that "especially given her history, the psychological impact of the disease on Mrs. Porter is substantial, making daily functioning a struggle." Tr. 358.

Regarding the plaintiff's ability to work, Dr. R. Blum stated that "due to distress from pain and the unpredictible [sic] presence of episodic mood fluctuations, Mrs. Porter would have a very difficult time sustaining concentration over an eight hour day in at least routine activity, or keeping a work schedule in a typical position with average performance demands. She might be able to manage part time work, or work in positions with flexible structure, allowing for periods of rest to cope with pain and regain emotional balance; work that could be performed at home, such as with a computer might be possible." Tr. 358.

Dr. R. Blum noted from observing plaintiff during the interview that she was obviously feeling physical discomfort. He noted, "At times, I have the impression that Mrs. Porter had to use deliberate focus of will to force her attention past discomfort, pain and distressing emotions." Tr. 352–53.

Plaintiff was seen by Stanley I. Mintz, Ph.D., on April 3, 1990, at the request of the Secretary. Tr. 365–67. After interviewing her, Dr. Mintz concluded, "Mrs. Porter exhibits significant clinical depression as well as reporting subjective pain. She appears to be a personable individual who, from a psychological point of view, is capable of relating to co-workers and supervisors. She seems able to handle her own affairs and concentrate on tasks. Her concentration at least for an eight hour period may be degraded because of her subjective pain symptoms." Tr. 367.

Stephen H. Blum, Ph.D., evaluated plaintiff on July 13, 1990. Test results and clinical observations supported Dr. R. Blum's conclusions that plaintiff suffered from chronic depression. Tr. 392. Dr. S. Blum recommended a consultation with a psychiatrist to determine whether medication would be of help in managing plaintiff's depression. He further recommended psychotherapy, but noted that plaintiff seemed resistant to the idea. Tr. 392–93.

Dr. S. Blum recommended that plaintiff participate in a multidisciplinary outpatient chronic pain treatment program with the following goals: to learn and practice relaxation techniques; to get in the best physical shape

possible; to learn to recognize patterns of overexertion; to get in touch with feelings and learn the connection between events, stress, feelings and pain; to develop regular sleeping and eating habits; to raise levels of self-esteem; to develop satisfying leisure time activities; to return to gainful employment; and to focus on managing, rather than curing, pain. Tr. 392–93. Dr. S. Blum agreed with Dr. R. Blum that plaintiff would have difficulty immediately returning to full time employment. However, Dr. S. Blum felt strongly that "the sooner she returns to work, the better her prognosis will be for continued improvement." Tr. 393. Dr. S. Blum noted that plaintiff was able to sit for periods of thirty minutes in his office before having to get up and move around. He suggested that she could sit in one place performing a job for a similar length of time. He concluded, "Allowances for periods of rest or stretching, flexible time scheduling, and initially part-time employ would help Mrs. Porter return to the work force." Tr. 393.

At the hearing conducted on May 6, 1992, plaintiff testified that on a typical day, she takes a one mile walk in the morning. Tr. 113–14. Plaintiff's doctors have advised her to get some exercise to try to keep her pain at a minimum and to maintain mobility. Tr. 114–15. Plaintiff testified that she has constant neck and back pain from fibromyalgia. Some days she also experiences pain in her shoulders, legs, hips and arms. Tr. 115.

Plaintiff testified that after her walk she might run an errand or stop at the grocery store, but then she must go home and rest. Plaintiff testified that she rests for several hours and then prepares a simple meal for dinner. After dinner, she puts the dishes in the dishwasher. Plaintiff watches television with her husband in the evening. Tr. 116–17.

Plaintiff testified that she rests in her recliner every day. Sometimes she will take a nap, but because of sleep disturbances at night, she tries not to sleep much during the day. Tr. 117–18. Plaintiff must limit her housekeeping activities and take rest breaks because of her pain. Plaintiff testified that she has a variety of methods of dealing with her pain, including hot baths, heating pads, back rubs, or chiropractic treatment. Plaintiff has taken a variety of pain medication in the past, but testified that they did little to ease her discomfort. Tr. 118–19.

Plaintiff testified that stress exacerbates her back pain and causes her back to cramp up. Plaintiff explained that any type of stress, including the stress of working, would cause her back to knot up. Tr. 122.

Plaintiff testified that she could sit for fifteen minutes before having to stand up. Plaintiff can travel short distances by car. Plaintiff walks one mile a day, which may take her 30 to 45 minutes. Tr. 127. Plaintiff testified that she thought she could lift seven to ten pounds. Tr. 128.

Plaintiff has suffered from depression throughout her life. Tr. 124. Plaintiff testified that her memory and concentration had deteriorated in the past few years. Tr. 130.

Plaintiff's weekly housekeeping activities include making the bed and loading the dishwasher every day and doing two or three loads of laundry every week. Plaintiff's husband carries the laundry up and down the stairs. Plaintiff testified that she dusts only every three or four months. Tr. 132–33.

Plaintiff testified that her pain would prevent her from performing her previous job as a housecleaner because of her limitations on pushing and reaching. Tr. 133. Plaintiff claimed to be unable to lift the bags of money as required in her previous job as a bank teller. Plaintiff testified that she would be unable to perform her previous work as a secretary or bookkeeper for more than fifteen to thirty minutes without having to lie down and rest. Tr. 134. Plaintiff felt unable to concentrate even four hours a day. Tr. 135.

Plaintiff testified that she experienced a great deal of muscle cramps in her back and shoulders. Tr. 122. Plaintiff's husband confirmed this in his testimony. Tr. 138. Plaintiff's husband testified that plaintiff had decreased her activities over the years. Tr. 139.

Lynn I. DeMarco, M.D., a specialist in internal medicine and allergy, immunology and rheumatology, was retained by the Sec-

retary to review the plaintiff's medical records and to testify as a medical expert. Tr. 470, 145. Dr. DeMarco evaluated all of plaintiff's medical records and listened to the hearing testimony of plaintiff and her husband. Tr. 145–46. Dr. DeMarco testified that fibromyalgia is a rheumatological disorder of the soft tissue which causes complaints of fatigue, musculoskeletal aches and pains, and sleep disturbance. It is a syndrome related to sleep deprivation. Dr. DeMarco stated that its cause was a lack of non-REM sleep. While the patient may not feel rested when she awakes, the patient usually is not aware that she is not sleeping well. Tr. 147. Dr. DeMarco characterized fibromyalgia as a problem of fatigue and non-restful sleep, which produces various musculoskeletal aches and pains. Tr. 148.

Dr. DeMarco testified that patients with fibromyalgia may experience pain in the neck and extremities and may suffer from headaches. He testified that usually this pain is not severe and it rarely causes severe muscle spasms. Dr. DeMarco stated that patients more often feel out of sorts and not rested. While musculoskeletal aches are a part of the disorder, severe spasms and weakness are not. Tr. 148.

The disorder is not included in the Secretary's Listing of Impairments [3] and is considered by the American Rheumatism Foundation to be a non-disabling condition. Tr. 148. Fibromyalgia is a form of soft tissue rheumatism and is classified as a disorder or dysfunction rather than a disease. Dr. DeMarco testified that the current recommendation of the country's expert rheumatologists is that patients with this problem should increase their level of activity. While the condition may cause patients to engage in less physical activity, Dr. DeMarco testified that it is recommended that patients return to their prior levels of activity or even increase their levels of activity. Tr. 149.

Plaintiff's medications included Dolobid, a non-steroidal anti-inflammatory. Dr. DeMarco testified that Dolobid (which is similar to ibuprofen) would be expected to be of little help since fibromyalgia lacks a significant inflammatory component. Plaintiff also took two diuretics for water retention and Zantac and Dicyclomine for irritable bowel syndrome. Tr. 150. Plaintiff also took Nitrostat on an as-needed basis for chest pain, although tests showed no evidence of coronary artery disease. Tr. 150–51. Plaintiff has also taken Voltarin, another non-steroidal anti-inflammatory, and aspirin, neither of which would be expected to be beneficial. Tr. 151. Dr. DeMarco testified that plaintiff's irritable bowel syndrome could be related to the fibromyalgia. Tr. 151.

Dr. DeMarco testified that he could accept the diagnosis of fibromyalgia in part. He testified that plaintiff's complaints of weakness were not consisted with a diagnosis of fibromyalgia. According to Dr. DeMarco, fibromyalgia does not cause muscle weakness. Tr. 152–53.

Vocational expert Karen Sherwood testified at the hearing of May 6, 1992. Tr. 156. The expert classified plaintiff's previous occupations as sedentary (loan processor/collections officer and secretary) and light (bookkeeper, head teller, florist, and housecleaner). Tr. 159. Based on the ALJ's hypothetical, the vocational expert testified that plaintiff could return to her prior work as a loan processor/collections officer or secretary. Tr. 160–61. The expert stated that alternatively, plaintiff could perform unskilled work such as information clerk or security monitor. Tr. 161. In the State of Kansas, approximately 3,815 jobs as information clerk and approximately 700 jobs as security monitor are available. Nationwide, approximately 458,000 information clerk and 14,315 security monitor positions are available. *Id.*

At the hearing conducted October 15, 1990, vocational expert Mary Titterington testified. Tr. 89. She classified plaintiff's previous occupations as follows: sedentary, semiskilled (loan processor); light, semiskilled (head teller, bank teller, florist, computer operator); light, skilled (manager/owner of cleaning service); medium, semiskilled (secretary in a job requiring lifting of up to 30 pounds; secretary is generally light or sedentary). Tr. 90–91. The expert testified that plaintiff had a variety of transferable skills, including opera-

---

**3.** *See* 20 C.F.R. Part 404, Subpt. P, App. 1, Pt. A, Sec. 100 (Musculoskeletal System).

tion of a computer, typewriter and adding machine, interviewing of prospective employees, scheduling, training and evaluation of employees and sales skills. These skills would transfer to a number of other light or sedentary occupations including receptionist, general office clerk, interviewing clerk, order clerk, record clerk, telemarketer or payroll clerk. Tr. 91–93.

The Secretary uses a five-step process for deciding whether a Social Security claimant is disabled. The Tenth Circuit Court of Appeals summarized the process as follows:

> In evaluating an applicant's condition to determine whether a disability exists, a series of questions are asked in turn. *See* 20 C.F.R. 404.1520(a) etc. If the claimant is presently pursuing work that constitutes gainful activity, then that person is not disabled, even if medically impaired. If the claimant is not presently doing substantial gainful activity, then the question is asked—does the claimant have a severe impairment which significantly limits his physical or mental ability to do basic work activities? If not, there is no disability. If the claimant has a severe impairment, then the question is asked—does that impairment meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, and if it has lasted or can be expected to last for at least 12 months, the person is considered disabled and there is no need to proceed further. If the impairment does not meet or equal a listed impairment, then the question is asked whether the impairment, when considered along with the applicant's residual functional capacity and the physical and mental demands of the job, prevent the applicant from doing past relevant work? If not, then there is no disability. If, however, claimant can not return to past work, the final question is whether the residual functional capacity, age, education, and work experience allow the performance of other work. If not, a finding of disability will be made.

*Kemp v. Bowen,* 816 F.2d 1469, 1474–75 (10th Cir.1987). This case was decided at the fourth step of the analysis. At this step,

the burden is on the claimant to show that she cannot perform her relevant past work.

■■■■ The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989). It is not the duty of the court to reweigh the evidence, or substitute its decision for that of the ALJ. *Talbot v. Heckler,* 814 F.2d 1456, 1461 (10th Cir.1987). Substantial evidence, however, must be more than a mere scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. at 1428. This court's determination entails a review of "the record as a whole, and 'the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Talbot,* 814 F.2d at 1461. (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965).

In his decision, the ALJ found that plaintiff suffered from impairments which restricted her capacity to perform some basic work activities. Tr. 20. In evaluating plaintiff's credibility, the ALJ noted that plaintiff had a sporadic work history with below average earnings, and little financial incentive to return to work. The ALJ noted the expert medical testimony that fibromyalgia is not normally a disabling condition and that normal treatment includes an increase in the patient's level of activity. The ALJ noted that this testimony was consistent with the testimony of plaintiff's treating psychologist, who suggested that plaintiff return to work as soon as possible. There was no medical evidence of coronary artery disease. Plaintiff's irritable bowel syndrome appeared to be under control. The ALJ found that given her mental impairment, plaintiff would have

some difficulty sustaining concentration over an eight hour day. The ALJ noted that plaintiff's doctors indicated that she could return to the work force. Tr. 24.

The ALJ found substantial evidence that the combination of plaintiff's impairments were of such severity as to prevent her from lifting more than ten pounds; to require a sit/stand option; and to require reasonable access to a restroom. The ALJ found her complaints of pain not to be severe enough to preclude work. The ALJ found that plaintiff had a mental impairment which would nevertheless allow her to interact with co-workers, respond appropriately to supervisors, understand instructions, and perform simple uncomplicated jobs. The ALJ concluded that plaintiff could perform her prior sedentary work as a secretary or loan processor/collection officer. Alternatively, the ALJ found that plaintiff could perform sedentary unskilled work such as security monitor or information clerk, jobs which exist in significant numbers.

The ALJ found that the claimant's impairments would restrict her to performing sedentary work activities. He found that her mental impairment did not significantly limit her ability to perform basic work activities. He concluded that plaintiff had failed in her burden of establishing that she could not return to her past relevant work as a secretary or loan processor/collection officer. Thus, the plaintiff was not "disabled" within the meaning of the Social Security Act. Tr. 25–26.

The plaintiff argues that the ALJ made several errors in deciding her claim and that the Secretary's decision is not supported by substantial evidence.

■ The plaintiff argues that the ALJ improperly evaluated the opinion of her treating physician and improperly relied on the opinion of a reviewing physician. For present purposes, physicians are divided into three groups: treating physicians, consultative examining physicians, and reviewing physicians. The reports and opinions of the claimant's treating physician are to be given the most weight by the Secretary. The re-

ports and opinions of a consultative examining physician are given less weight. Finally, the reports of a reviewing physician (one who does not examine the claimant and who merely reviews medical records) are accorded the least weight. *Talbot v. Heckler,* 814 F.2d 1456, 1463 (10th Cir.1987). If the Secretary rejects the medical opinion of treating physicians, specific, legitimate reasons for doing so must be set forth. *Id.* at 1464.

■ Plaintiff argues that the ALJ erroneously relied on the medical expert who testified that fibromyalgia is normally a disorder that is not disabling. Tr. 24. Plaintiff cites *Cline v. Sullivan,* 939 F.2d 560, 567 (8th Cir.1991) for the proposition that fibromyalgia may be disabling. In that case, the plaintiff's treating physician opined that fibromyalgia can, although will not usually, result in total incapacitation. The Eighth Circuit reversed the Secretary and found the plaintiff to be disabled. *Id.* In the present case, the ALJ noted that fibromyalgia is not normally disabling. Such a finding is not contrary to the holding of *Cline.* The court need not decide the broader question of when or whether fibromyalgia may be found to be disabling.

Plaintiff argues that the ALJ erred in giving more weight to the comments of the reviewing physician than to the plaintiff's treating physician. After reviewing the record, the court finds that the opinions of Dr. Schnose and Dr. DeMarco are consistent. A review of the ALJ's decision reveals that the ALJ did not reject the medical opinion of plaintiff's treating physician, Dr. Schnose.

In August 1988, Dr. Schnose indicated that plaintiff was not disabled. In November 1988, Dr. Schnose recommended a work hardening program. In letters written in October 1989 and December 1989, Dr. Schnose indicated that plaintiff could work on a part-time basis.[4] In an October 1990 questionnaire, Dr. Schnose's responses indicate generally that plaintiff could tolerate sedentary work activities. In March 1991, Dr. Schnose indicated that plaintiff was not fully disabled. There is no indication in the record that Dr. Schnose ever suggested that plaintiff was

---

4. Part-time work may constitute substantial gainful activity. 20 C.F.R. 404.1572(a).

disabled by fibromyalgia. His suggestions reflect a recommendation that plaintiff attempt to return to work. It appears that none of plaintiff's treating physicians have stated that she is disabled.[5]

Further, the two psychologists consulted by the plaintiff agreed that plaintiff should return to work. Dr. R. Blum stated that plaintiff could perform part-time work, work in a job with a flexible schedule, or work at home. Dr. S. Blum recommended that plaintiff return to gainful employment. He acknowledged that plaintiff could not return to full-time work immediately, but stated that the sooner plaintiff returned to work, the better her prognosis.

■ Plaintiff argues that the ALJ failed to properly evaluate her complaints of pain and applied the wrong legal standard in the consideration of plaintiff's subjective complaints of pain. The Tenth Circuit Court of Appeals described the procedure for analyzing pain as follows:

> If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. "[T]he impairment or abnormality must be one which 'could reasonably be expected to produce' the *alleged* pain." At this stage, the decision maker takes the subjective allegations of pain as true in determining whether they are reasonably related to the proven impairment. He does not evaluate the claimant's credibility. If the nexus between impairment and pain alleged is insufficient, the claimant cannot receive benefits based upon disabling pain. If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling. This evidence includes the medical data previously presented, any other objective indications of the degree of the pain, and subjective accounts of the severity of the claimant's pain. Only at this point may the decision maker decide whether he believes the claimant's assertions of pain.

*Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir.1987) (citations omitted).

The first step requires only a loose nexus between the alleged pain and the medical evidence. "[I]f an impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence." *Id.* at 164. In this case there is no argument that plaintiff has a medically diagnosed condition that is reasonably expected to produce pain.

At the second step, the ALJ is to consider several factors, including the claimant's credibility, persistent attempts to find relief, willingness to try any treatment prescribed, regular contact with physicians, daily activities, medication, and psychological disorders. *Id.* at 165–66.

■ It appears that plaintiff's chief complaint regarding the pain analysis arises from the ALJ's credibility determination. Plaintiff argues that the ALJ failed to adequately explain his reasons for finding plaintiff's complaints of pain only partially credible. Specifically, the plaintiff argues that the ALJ failed to consider her daily activities, duration, frequency and intensity of pain, the dosage, effectiveness and side effects of medication, precipitating and aggravating factors, and functional restrictions. In his findings, the ALJ found plaintiff's testimony to be partially credible when considered in light of the medical signs and findings, her history of medical treatment, the reports of treating and examining physicians, and the inconsistencies within her testimony. Tr. 26. While the ALJ's discussion of these factors within the body of his opinion could have been more detailed, the court cannot find that the ALJ erred. The failure to recite the list of every factor identified in *Luna* is not error.

■ In analyzing plaintiff's credibility, the ALJ noted that plaintiff had a history of below average earnings and had little financial incentive to return to work. The ALJ noted Dr. DeMarco's testimony that plaintiff should increase her level of activity. The

---

**5.** The court notes that plaintiff's chiropractor is not an acceptable medical source of evidence about plaintiff's impairment. 20 C.F.R. 404.1513(a).

ALJ found this testimony to be consistent with the recommendation of Dr. S. Blum that plaintiff return to work as soon as possible. The ALJ found that the plaintiff's own estimation of her residual functional capacity was inconsistent with those made by her physician and chiropractor and likewise was inconsistent with the medical evidence of record. The ALJ noted that plaintiff had complaints of chest pain, but that tests revealed no evidence of coronary artery disease. There was no evidence that plaintiff's chest pain was musculoskeletal in origin. The ALJ noted that plaintiff had received little treatment for and had made few complaints about her irritable bowel syndrome since being prescribed medication. The ALJ noted that there was evidence that plaintiff would have some difficulty sustaining concentration over an eight hour day. However, all the medical experts expressed the opinion that plaintiff should increase her level of activity and return to work. The ALJ concluded by finding the testimony of the plaintiff to be only partially credible.

After examining the record, the court finds that the ALJ properly analyzed the plaintiff's complaints of pain under *Luna* and did not err in finding plaintiff's complaints of pain to be only partially credible. The ALJ's findings are consistent with the medical evidence of record.

■ Plaintiff next asserts that the ALJ failed to consider the plaintiff's impairments in combination. Specifically, plaintiff argues that the ALJ improperly discounted the psychological evidence of record.

The ALJ found that plaintiff suffered from depression and dysthymia. Tr. 28–29. In analyzing her mental impairment, the ALJ found that her impairment was not severe enough to meet the Secretary's Listing of Impairments. Tr. 30. The ALJ found that plaintiff experienced only a slight restriction of activities of daily living, slight difficulties in maintaining social functioning, and seldom experienced deficiencies of concentration, persistence or pace. Tr. 30. This finding is supported by substantial evidence.

Dr. R. Blum diagnosed plaintiff as suffering dysthymia or chronic depressive neurosis. Dr. S. Blum agreed with Dr. R. Blum's diagnosis. However, neither of them found plaintiff's mental impairments to be so severe as to preclude all work activities. Dr. R. Blum indicated that plaintiff could have difficulty sustaining concentration over an eight hour day. Tr. 358. Dr. S. Blum did not make any specific finding regarding plaintiff's ability to concentrate, but noted that plaintiff's depression was hindering her return to employment. Dr. S. Blum did recommend a course of treatment with the stated goal of returning to work. Consulting psychologist Dr. Mintz found that plaintiff was capable of relating to coworkers and supervisors. Dr. Mintz agreed that plaintiff's concentration could degrade over an eight hour day. Tr. 367. The ALJ took this evidence into consideration in finding that the plaintiff suffered from a mental impairment which would affect her ability to concentrate, but that plaintiff could interact with coworkers, respond appropriately to supervisors, understand instructions, and perform simple uncomplicated jobs.

■ The ALJ's finding that the plaintiff could perform simple uncomplicated sedentary jobs is supported by substantial evidence. The court disagrees, however, with the ALJ's finding that the plaintiff could return to her previous occupations of loan processor/collection officer and secretary. The court cannot agree that these occupations qualify as "simple uncomplicated" jobs.

■ Based on the matters contained in the administrative record, the plaintiff met her burden of proving at step 4 that she was unable to return to her previous relevant work. The ALJ's decision to the contrary is not supported by substantial evidence. Since this case was decided at step 4 of the five step analysis, remand would normally be in order. However, the matters already in the record indicate that the Secretary has met her burden of proving that the plaintiff is capable of performing other work which exists in the economy, given plaintiff's residual functional capacity, age, education and work experience. The vocational expert identified two jobs that plaintiff could perform in the sedentary, unskilled category and testified regarding the number of such jobs available

in the Kansas economy. This is sufficient to meet the Secretary's burden of proof.

As discussed, the court must reverse the ALJ's decision that plaintiff could perform her past relevant work as a secretary or loan processor/collection officer. These occupations do not meet the limitation of simple uncomplicated jobs that the ALJ found to be applicable to the plaintiff. However, given the state of the record, remand for further proceedings is unnecessary. The Secretary has already met her burden of proof at the fifth and final step of the sequential evaluation process.

**IT IS BY THE COURT THEREFORE ORDERED** that the decision of the Secretary is hereby AFFIRMED.