DECISION
Before this Court is an appeal from a November 21, 1996 decision by the Rhode Island Department of Human Services ("DHS") denying Bruce Pratt (the "applicant") medical assistance benefits on the grounds of disability under G.L. 1956 § 40-8-1, etseq. Mr. Pratt, seeking a reversal of the DHS decision, filed his appeal on December 17, 1996. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
Facts/Travel
The applicant, a thirty-nine-year-old-male housepainter, was admitted to St. Joseph's Hospital on June 15, 1996, for chest tightness and shortness of breath. As part of the application process for medical assistance, the applicant submitted two forms. The first form he submitted was an AP-70, Information for Determination of Disability Form (AP-70), dated June 17, 1996. In this form, the applicant stated that he was suffering from congestive heart failure and an enlarged heart. See AP-70. He also complained of breathing problems associated with physical activity, occasional chest pain, persistent coughing, and insomnia. The applicant stated that he was confined to bed and could get around to prepare food only with personal help. In response to later questions on the same form, the applicant acknowledged that he was able to cook, do dishes, dust, drive a car, and that he did not need personal help to "get places." The applicant described himself as a high school graduate and painter for sixteen years.
The second form submitted by the applicant was an MA-63 Physician's Examination Report. The applicant's treating physician, Dr. Klie, signed this form. See MA-63, dated June 19, 1996. Dr. Klie diagnosed applicant as having atrial fibrillation and cardiomyopathy. He stated that the applicant's impairment was expected to last more than twelve months or result in death, but that the prognosis for recovery was fair. He then determined that the applicant was capable of the following functions during an eight-hour period: walking for two hours, sitting for eight hours, standing for one hour, and reaching for one hour. He recommended that the applicant not bend, stoop, or walk rapidly and that he do only minimal stair climbing. He permitted the applicant occasionally to lift up to ten pounds and to carry five pounds. Dr. Klie placed no limitations on the applicant's mental activities, determining that the applicant was capable of remembering and carrying out simple instructions, maintaining attention and concentration in order to complete tasks in a timely manner, making simple work-related decisions, interacting appropriately with coworkers and supervisors, working at a consistent role without extraordinary supervision, and responding appropriately to changes in work routine or environment. This diagnosis was supported by an echocardiogram performed on June 17, 1996.
On June 21, 1996, the applicant was discharged from the hospital. In the discharge summary, Dr. Klie diagnosed the applicant with atrial fibrillation and cardiomyopathy which was possibly related to excessive ethanol. See Discharge Summary dated June 21, 1996. He stated that there were no complications and that the applicant's condition had "improved with better control of [heart] rate." He prescribed Coumadin, Lanoxin, Accuprid Cardizem C.D. and recommended a follow-up examination.
Upon receiving the application and accompanying documents, DHS forwarded the information to the Medical Assistance Review Team ("MART") for consideration. MART determined that the applicant was ineligible for disability, being capable of performing light work. See Disability Review and Decision, Form PA-65, dated August 1, 1996. On August 26, 1996, DHS sent a letter of denial to the applicant stating that he was not totally disabled as set forth in the DHS Manual, Sec. 0352. See Form AP-167. The applicant filed a timely appeal of that notice, and an Administrative Hearing was conducted on October 15, 1996.
Present at the Administrative Hearing were the applicant; Mr. James Racine, appeals officer; Mr. Paul McCann, medical assistance; and Ms. Nancy Hart, the applicant's friend. See DHS Appeals Office Transcript in the Hearing of Bruce Pratt (Transcript at 2). Mr. McCann testified that the Medical Assistance Review Team, comprising an M.D. and an R.N., considers all of the information before it in order to make its determination. (Transcript at 1-2.) The team reviews the applicant's existing medical condition, age, educational background, and capability of being trained. Mr. McCann then testified that based on the information provided and because of the applicant's age and educational background, MART believed that the applicant was capable of performing "some type of light occupation." (Transcript at 5.)
The applicant testified that his doctor told him to stay out of work for at least a year and that the doctor had been unable to regulate his blood for the purpose of cardio-conversion. (Transcript at 9). He further testified that he gets dizzy when he walks upstairs, gets drowsy as a result of his medication and gets lightheaded if he stands up fast. Id. In response to the question "and are you not able to work?" applicant responded ". . . I can't do nothing. I wish I could." (Transcript at 11.) After Mr. McCann defined for the applicant the terms "total" and "permanent" disability, the applicant asked "[b]ut then, how would I receive one of these jobs with the limitations I do have? Who would hire me for, you know, making, you know, making these limitations?" (Transcript at 9.)
On November 21, 1996, DHS issued its decision, denying the applicant medical assistance. DHS stated that he did not meet the disability standards. See Administrative Hearing Decision. In its finding of facts, DHS referred to the background information submitted along with a summary of all of the testimony given at the hearing. The decision then cited to portions of the regulations in the Rhode Island Department of Human Services Manual as the basis for its legal conclusions. Referring to the recommendations made by the applicant's own doctor, DHS stated ". . . that although the appellant does have a cardiac condition that is somewhat disabling, he is capable of performing some physical activities. The appellant also testified that although he may be capable of performing some type of work, nobody would hire him in his condition. The appellant testified that his condition has stabilized." DHS then concluded that the applicant ". . . is capable of performing at least sedentary-type work," thus being ". . . capable of performing substantial, gainful work." The decision noted that "[i]n reaching the above conclusions, the appellant's age (39), education (high school graduate), and vocational experience were considered."
On December 17, 1996, the applicant filed a timely notice of appeal to this Court. In his complaint, the applicant alleges that the DHS decision violates constitutional, federal and regulatory provisions governing the medical assistance program and that it was made upon unlawful procedure. The applicant also alleges that DHS abused its discretion, violated the state Administrative Procedures Act and that the decision was clearly erroneous in view of the reliable, probative and substantial evidence of record. The applicant asks this Court to reverse the decision or, in the alternative, to reverse and remand this case to the administrative tribunal for the making of proper findings of fact and conclusions of law.
Standard of Review
The review of a DHS decision by this Court is controlled by R.I.G.L § 42-35-15 (g), which provides for review of a contested agency decision:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 "(1) In violation of constitutional or statutory provisions; "(2) In excess of the statutory authority of the agency; "(3) Made upon unlawful procedure; "(4) Affected by other error of law; "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact.Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). This reference to the administrative tribunal applies even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept. ofEmployment Security, 414 A.2d 480, 482 (R.I. 1980). The court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). Questions of law, however, are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts.Carmody v. R.I. Conflict of Interest Commission, 509 A.2d at 458. The Superior Court's role is to examine whether any competent evidence exists in the record to support the agency's findings.Rocha v. Public Util. Comm'n, 694 A.2d 722, 725 (R.I. 1997)(per curiam). This Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence.Rhode Island Public Telecommunications Authority, et al. v. RhodeIsland Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
The Department of Human Services
The Rhode Island Department of Human Services is an agency within the executive branch of state government. G.L. 1956 §42-12-1, et seq. Pursuant to its statutory mandate, DHS is responsible for the management of state and federally funded public financial assistance programs. G.L. 1956 § 42-12-4. One such program is the Medical Assistance Program which DHS administers within standards of eligibility, as enumerated in G.L. 1956 § 40-8-3. For all eligible individuals, DHS must pay benefits pursuant to the regulations it must develop and have approved by the federal government as comporting with federal requirements in order to receive federal funding.
Title XIX of the Federal Social Security Act sets forth the provisions of the medical assistance program. 42 U.S.C. § 1396,et seq. "The purpose of the Medicaid program is to furnish medical assistance to disabled individuals who are without funding to meet the necessary medical costs." Social Security Act, § 1910, as amended, 42 U.S.C. § 1396. With regard to the eligibility criteria for this needs-based program, the state and federal governments have the ability to create laws and regulations under the authority of Title XIX of the Social Security Act and G.L. 1956 § 40-8-1, et seq. In the creation of Medicaid eligibility criteria, the state is obligated to follow the methodology determination of the Supplemental Security Income ("SSI") program. See 42 U.S.C. § 1396, et seq. and Social Security Act § 1902 (R)(2)(a). Title XIX requires that the state establish a State Plan to be approved by the United States Department of Health and Human Services ("HHS") in order for the state to qualify for federal funding. Hole v. State,433 A.2d 374 (Me. 1981); G.L. 1956 §§ 40-8-1(c) and 40-8-5.
Standards Governing the Determination of Eligibility
In the instant action, the applicant contends that DHS erroneously concluded that he was ineligible for medical assistance. The applicant avers that DHS applied the incorrect procedure and made inadequate findings of fact and unsubstantiated conclusions of law. In his brief, the applicant alleges that DHS failed to follow a federally mandated five-step evaluation process in reaching its determination.
DHS responds that it reviewed and relied upon the evidence before it, made credibility findings in accordance with the law, and was able to make its determination at the second step of the evaluation process. DHS states that the applicant's own testimony that he could work, in conjunction with the medical reports and MART findings, led the hearing officer to his determination.
The DHS Policy Manual sets out the procedure for determining an individual's eligibility for medical assistance benefits. The DHS Policy Manual at § 0352.15 determines eligibility based on disability and states the following:
 To be eligible for Medical Assistance because of permanent and total disability, a person must have a permanent physical or mental impairment, disease or loss, other than blindness, that substantially precludes engagement in useful occupations . . . . within his/her competence. . . .
 For purposes of eligibility, an individual is disabled if s/he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted, or can be expected to last for a continuous period of not less than twelve (12) months. . . .
 Statements of the applicant, including the individual's own description of the impairment (symptoms) are, alone, insufficient to establish the presence of a physical or mental impairment.
Whether an impairment constitutes a disability is determined by applying § 0352.25.05 of the DHS Policy Manual which states:
. . . an impairment in a particular case . . . is determined from all the facts of that case. Primary consideration is given to the severity of the individual's impairment. Consideration is also given to such other factors as the individual's age, education and work experience. Medical consideration alone can justify a finding that an individual is not under a disability where the only impairment is a slight neurosis, slight impairment of sight or hearing, or other slight abnormalities. On the other hand, medical considerations alone . . ., can, except where other evidence rebuts a finding of "disability," e.g., the individual is actually engaging in substantial gainful activity, justify a finding that the individual is under a disability where the impairment is one that meets the duration requirement, and is compatible with impairments recognized by the Social Security Administration.
Section 0352.15.10 of the DHS Policy Manual states:
 Conditions which constitute neither a recognized impairment nor the medical equivalent of a recognized impairment may be found disabling if they do, in fact, prevent the individual from engaging in any substantial gainful activity. Such an individual shall be determined to be under a disability only if the physical or mental impairment(s) are the primary reason for an inability to engage in a substantial gainful activity. In such a case it must be established that the physical or mental impairment(s) are the primary reason for an inability to perform significant functions such as moving about, handling objects, hearing, speaking, reasoning and understanding, that the individual is not only unable to do any of the previous work s/he may have done or work commensurate with any such previous work, but the individual cannot, considering age, education, and work experience, if any, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which the individual lives, or whether a specific job vacancy exists, or whether the individual would be hired if s/he applied for work.
Under the federal program, the Secretary of Health and Human Services has established a five-step sequential evaluation process for determining whether a person is disabled. Federal regulations pose the following questions:
 (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. P. 404, Subpt. P., App. 1? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work in the economy?
20 C.F.R. § 416.920 (1997).
An affirmative answer to questions one, two or four leads to the next question in the sequence; an affirmative answer to questions three or five leads to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled." McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986) (citing 20 C.F.R. § 416.920 (a)-(f)).
Under step two of the severity regulation, "[i]f the claimant does not have a severe impairment or combination of impairments, the disability claim is denied." Bowen v. Yuckert, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119, 126-127 (1987). Both the language of the Act and its legislative history support the Secretary's decision to require disability claimants to make a threshold showing that their "medically determinable" impairments are severe enough to satisfy the regulatory standards. Yuckert,
482 U.S. at 145, 107 S.Ct. at 2293, 96 L.Ed.2d at 129. The Supreme Court reasoned that the Social Security Act "defines disability in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace," and that the inability of a claimant to demonstrate that his "impairments are . . . severe enough to limit significantly the claimant's ability to perform most jobs" adequately signals that "the impairment does not prevent the claimant from engaging in substantial gainful activity." Yuckert, 482 U.S. at 146, 107 S.Ct. at 2293, 96 L.Ed.2d at 129.[1]
In addressing the legislative history of the Act, the Court stated that, in making a finding of disability, "`[t]he physical or mental impairment must be of a nature and degree of severity sufficient to justify its consideration as the cause of failure to obtain any substantial gainful work. Standards for evaluating the severity of disabling conditions will be worked out in consultation with the State agencies.'" Yuckert, 482 U.S. at 147, 107 S.Ct. at 2294, 96 L.Ed. 2d at 130, quoting S. Rep. No. 1987, 83d Cong., 2d Sess., 21 (1954). The Court acknowledged that "`medical considerations alone may justify a finding that an individual is not under a disability where the only impairment is a slight neurosis, slight impairment of sight or hearing, or other similar abnormality or combination of slight abnormalities." Id. Furthermore, the Court stated that "[i]f a claimant is unable to show that he has a medically severe impairment, he is not eligible for disability benefits," and that [i]n such a case, there is no reason for the Secretary to consider the claimant's age, education, and work experience."Yuckert, 482 U.S. at 148, 107 S. Ct. at 2295, 96 L.Ed.2d at 131.
The Court noted that "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account. Yuckert, 482 U.S. at 153, 107 S.Ct. at 2297, 96 L.Ed.2d at 134. The severity regulation plainly adopts a standard for determining the threshold level of severity: the impairment must be one that "significantly limits your physical or mental ability to do basic work activities." See id. at n. 11.
The threshold inquiry at step two allows only claims based on the most trivial impairments to be rejected. Holley v. Chater,931 F. Supp. 840, 844 (S.D. Fla. 1996). If the ALJ finds no severe impairment, the evaluation ends. Id. If a severe impairment is found, the ALJ proceeds to step three. Id. At step three, the ALJ must determine whether the claimant's impairment meets or equals one of the listed impairments set forth in 20 C.F.R. Pt. 404 Subpt. P, Appendix 1. Id. If the answer to step three is yes, the claimant is conclusively presumed to be disabled. Id. If the answer is no, the ALJ moves on to step four to determine if the claimant is able to perform his past relevant work despite his "severe impairment". Id.
At step four, the initial burden is on the claimant to show that [he] can no longer perform [his] former work because of [his] impairments. Manso-Pizarro v. Secretary of Health and HumanServices, 76 F.3d 15, 17 (1st Cir. 1996). At that point the ALJ must compare the physical and mental demands of that past work with current functional capacity. Id. The individual's residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Part 404, Subpt. P, Appendix 2. When assessing the person's RFC, symptoms (such as pain) and laboratory findings, together with other obtained evidence, are considered. Id. "In making a step four appraisal, the ALJ is entitled to credit a claimant's own description of [his] former job activities and functional limitations . . . but has some burden independently to develop the record." Id. If the claimant is able to perform his past relevant work, the claimant is not disabled and the analysis ends. Holley, 931 F. Supp. at 844. However, if the claimant is not able to perform his past relevant work, the ALJ must proceed to step five. Id. at 844-845.
At step five, the ALJ must determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience. Holley, 931 F. Supp. at 845. The claimant is entitled to a finding of disability only if he is not able to perform other work. Id. The Secretary has the burden of showing that jobs are available. Brown v. Secretary of Healthand Human Services, 740 F. Supp. 28, 35 (D. Mass. 1990). To satisfy this burden, the Secretary has promulgated a set of medical-vocational guidelines ("the Grid") to simplify the application of the fifth test. Id. See 20 C.F.R. Part 404, Subpt. P, Appendix 2. The Grid is designed to enable the Secretary to satisfy this burden in a streamlined fashion without resorting to the live testimony of vocational experts. Ortiz v. The Secretaryof Health and Human Services, 890 F.2d 520, 524 (1st Cir. 1989). The Grid has been described as
 basically a matrix, combining different permutations of the four essential factors set out in the statute (age, education, work experience and residual work capacity) and stating, as to each combination, whether a claimant with each of those characteristics is "disabled" or "not disabled." It consists of three separate tables, one for those who retain the residual exertional capacity to perform `sedentary' work, one for those who retain the residual capacity to perform "light" work, and one for those who retain the residual capacity to perform "medium" work. Each table has five columns for rule number, age, education, work experience, and decision. Thus each row on the table presents a different combination of age, education, and work experience categories. The ALJ simply selects the proper table and row based on the characteristics he finds the claimant to possess, and reads the decision, `disabled' or "not disabled" from the right-hand column in that row."
Sherwin v. Secretary of Health and Human Services, 685 F.2d 1, 2 (1st Cir. 1982).
Appendix 2 states that
 [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
(20 C.F.R. Part 404, Subpt. P, Appendix 2.)
The Grid is meant to reflect the potential occupational base remaining to a claimant in light of his strength limitations.Ortiz v. The Secretary of Health and Human Services, 890 F.2d at 524. If a non-strength impairment, even though significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively. Id. Whenever an ALJ fails to take vocational testimony, he must be deemed in reality to have relied exclusively on the Grid to show the existence of jobs claimant could perform. Id. at n.4. The more that the occupational base is reduced by a nonexertional impairment, the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence. Id. at 524-525.
Analysis
The applicant here contends that DHS failed to make findings with respect to each step of the federally mandated disability evaluation. He specifically argues that by referring to his age, education and employment history in its decision, DHS compressed step five into step two, thereby violating the procedural requirements of the evaluation process. The applicant also contends that the Appeals Officer failed to give proper weight to the applicant's testimony, failed to explain his reasons for not finding that testimony credible and made a disability determination based on bare medical findings that is unsupported by the record.
DHS counters that it did not compress step five into step two, as the evaluation process ended at step two when the applicant failed to demonstrate that his impairments were severe. DHS also argues that the record supports the Hearing Officer's credibility determination; there is no affirmative obligation imposed on the Hearing Officer to articulate his rationale for discrediting the applicant's statements and that the Hearing Officer's determination that the applicant is "capable of performing at least sedentary-type work" and is not disabled is supported by the evidence.
In making the subject determination, DHS appropriately placed great emphasis on the reports made by the applicant's own treating physician concerning his residual functional capacity and work capabilities. The applicant's physician explicitly determined that the applicant was capable of walking for two hours, sitting for eight hours, standing for one hour, and reaching for one hour during an eight-hour period; recommended that the applicant not bend, stoop, or walk rapidly and that he do only minimal stair climbing; permitted the applicant occasionally to lift up to ten pounds and to carry five pounds; and placed no limitations on the applicant's mental activities, determining that the applicant was capable of remembering and carrying out simple instructions, maintaining attention and concentration in order to complete tasks in a timely manner, making simple work-related decisions, interacting appropriately with coworkers and supervisors, working at a consistent role without extraordinary supervision, and responding appropriately to changes in work routine or environment. These findings relating to the applicant's residual functional capacity were also interpreted by MART, which found that the applicant was capable of performing light work.
DHS also referred to a statement allegedly made by the applicant stating that he may be capable of performing some work and that his condition had stabilized. This Court can find no indication in the record, however, that the applicant in fact made those statements. Instead, the applicant's discharge summary stated that his condition "had improved with better control of [heart] rate," and the applicant's own testimony implied that he was physically capable of working because he queried as to who would hire him in his condition. DHS also considered the applicant's own application form which contained several inconsistent statements concerning his abilities. The applicant initially stated that he was confined to bed and needed personal help to get around and to prepare food. He then stated subsequently that he was able to cook, do dishes, dust, drive, and that he did not need personal help to "get places."
Based on this evidence, there is substantial evidence in the record to support the decision by DHS to discount the applicant's subjective complaints and to disregard his claims of disability. Multiple complaints of pain, by themselves, cannot render an applicant disabled under the Act. Martinez v. Shalala, 911 F. Supp. 37, 42 (D. Mass. 1996). A claimant's statement as to pain shall not be conclusive evidence as to disability. Avery v.Secretary of Health Human Services, 797 F.2d 19, 20 (1st Cir. 1986). Determining issues of credibility is the responsibility of the Administrative Law Judge, and such determination is given great deference by the Court. Martinez, 911 F. Supp. at 43. Noted inconsistencies of record give credence to the ALJ's decision.Holley v. Chater, 931 F. Supp. 840, 847 (S.D. Fla. 1996). Congress does not require an ALJ to make reciprocal negative findings and to give reasons for rejecting evidence; it requires only that the ALJ's findings be supported by substantial evidence. Cotter v.Harris, 642 F.2d 700, 709 (3d Cir. 1981). The DHS Hearing Officer had before him conflicting statements of the applicant that could have undermined the applicant's credibility. Thus, the agency's decision not to credit the applicant's subjective statements will not be disturbed and its failure to articulate its rationale for that decision (not being required by law) cannot be deemed error.
Additionally, the applicant's argument that DHS ignored the applicant's testimony and based its decision on raw medical data in contravention of Gordils v. Secretary of Health HumanServices, 921 F.2d 327 (1st Cir. 1990) is not supported by the record. "[Wlhere an ALJ reaches conclusions about [a] claimant's physical exertional capacity without an assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence. . . ." Perez v. Secretary ofHealth and Human Services, 958 F.2d 445, 446 (1st Cir. 1991). InGordils, the Court stated that "since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record." 921 F.2d at 329. The Court then stated, however, that this principle does not mean that the Secretary is precluded from rendering common-sense judgments about functional capacity based on medical findings. InGordils, the ALJ relied on a non-examining, non-testifying physician to render his decision.
In the instant case, the DHS Hearing Officer reviewed the medical findings submitted by the applicant's own treating physician who specifically delineated the extent of the applicant's residual functional capacity. Thus, the record evidences that the Hearing Officer did not impermissibly rely on raw medical data, as alleged by the applicant, but on the findings of residual functional capacity made by the applicant's own treating physician and those made by MART.
In addressing the applicant's claim that DHS impermissibly compressed step five of the evaluation process into step two, and DHS' counter argument that there was no compression because the evaluation process ended at step two when the applicant failed to demonstrate that his impairment was severe, the decision itself must be parsed. Admittedly, there may be some merit to ending the analysis at step two, based on the findings of the applicant's treating physician and MART and the applicant's lack of credibility. The agency's decision (in contrast to DHS' interpretation of the decision), however, suggests that the evaluation went beyond that step. The hearing officer stated that "although the applicant has a cardiac condition that is somewhat disabling, he is capable of performing some physical activities." He concluded that the applicant is capable of performing "at least sedentary-type work" and acknowledged that this conclusion took the applicant's age, education and vocational experience into account. These conclusions appear to indicate that the applicant had satisfied the threshold "minimal impairment" inquiry at step two and that in fact the Hearing Officer implicitly had conducted a five-step analysis.
Step three would have required the applicant to prove that his impairment met or equaled one of the impairments listed in the federal regulations. Although the agency's decision is silent as to this step of the impairment calculus, there is no evidence in the record to suggest, nor does the applicant argue, that he met one of the listed impairments. Implicitly, therefore, the Hearing Officer found that the applicant failed to sustain his burden at step three of the analysis.
Similarly, the agency's decision is silent as to step four of the impairment analysis which required the applicant to prove that due to his impairment, he is unable to perform his past work as a housepainter. When the Hearing Officer recommended that the applicant do sedentary-type work rather than the more demanding job of housepainter, however, he implicitly found that the applicant had satisfied his step four burden of proving that he could not return to his former job.
At step five, the burden of proving a disability shifted to DHS. The record indicates that the Hearing Officer relied on the findings which were made by both the applicant's own physician and those of MART as they related to the applicant's residual functional capacity, reviewed conflicting statements from the applicant concerning his capabilities and, in addition, considered the applicant's age, education, and vocational experience to conclude that the applicant is capable of performing at least sedentary-type work. A Hearing Officer is not required to cite to particular regulations or cases nor is he or she required to use particular phrases or formulations. Jamisonv. Bowen, 814 F.2d 585, 588-589 (11th Cir. 1987). Although the Hearing Officer did not specifically refer to the Grid in making his decision, it is clear from the record, the Grid[2] and the definition of sedentary work, that the Hearing Officer was not clearly wrong to conclude that the applicant was capable of performing at least sedentary-type work. Thus, the agency's procedure did not substantially prejudice the applicant.
Contrary to the applicant's position, the Hearing Officer here did not terminate the disability inquiry at step two while simultaneously making step five findings so as to import step five of the sequential analysis into step two.[3] He instead premised his decision on a five-step analysis, albeit without clearly making specific findings as to each step of the analysis. This case is more analogous, therefore, to Porter v. Chater, 895 F. Supp. 1427 (D. Kan. 1995), where the court refused to remand an action despite the fact that the evaluation process ended at step four when it should have proceeded to step five. There the court reasoned that although remand would normally be in order (given that the agency had erroneously determined under step four that the applicant could return to his former employment), the record indicated that the Secretary (although not making a step five analysis) had met her burden of proving under step five that the plaintiff was capable of performing sedentary work, given plaintiffs residual functional capacity, age, education and work experience. Id. at 1437.[4]
Similarly, in the case at bar, the record establishes that DHS met its step five burden of proving that the applicant is capable of performing sedentary-type work which exists in the economy given his residual functional capacity, age, education and work experience. While it would have been preferable for the Hearing Officer to more clearly delineate his findings as to each tier of the five-step disability analysis, his failure to do so on the state of this record does not constitute legal error warranting a reversal or remand, nor did it prejudice the applicant.
This Court finds, therefore, that the decision of the Rhode Island Department of Human Services denying the applicant disability benefits is supported by the reliable, probative, and substantial evidence of record and that substantial rights of the applicant have not been prejudiced by that decision. Accordingly, that decision is hereby affirmed.
[1] The claimant bears the burden of proof at steps one, two and four; if the process ends at step two, the burden of proof never shifts to the Secretary. See Yuckert, 482 U.S. at 146, 107 S.Ct. at 2294, 96 L.Ed.2d at 130 n.5.
[2] Under Rule 201.28 of the Grid, either an unskilled or semiskilled, high school graduate, age 18-45, whose skills are not transferable is deemed not disabled for purposes of performing light or sedentary work. 20 C.F.R. Part 404, Subpt. P, Appendix 2. Section 201.00 (h) illustrates an example: "An individual under age 45 with a high school education can no longer do past work and is restricted to unskilled sedentary jobs because of a severe medically determinable cardiovascular impairment (which does not meet or equal the listings in appendix 1). A permanent injury to the right hand limits the individual to sedentary jobs which do not require bilateral manual dexterity. None of the rules in appendix 2 are applicable to this particular set of facts, because this individual cannot perform the full range of work defined as sedentary. Since the inability to perform jobs requiring bilateral manual dexterity significantly compromises the only range of work for which the individual isotherwise qualified (i.e., sedentary), a finding of disability would be appropriate." 20 C.F.R. Part 404, Subpt. P, Appendix 2. (emphasis added.) This example warrants a conclusion that had the individual not suffered from a permanent injury to the right hand (i.e., suffered only from impairments such as those of the applicant), that individual would not have been found disabled for purposes of performing sedentary-type work.
[3] This case is distinguishable, therefore, from the case ofMcDaniel v. Bowen, 800 F.2d 1026, 1032 (11th Cir. 1986), in which the court concluded that the ALJ erred in terminating the disability inquiry at step two where the ALJ had used a step five determination that the applicant was able to perform other work given his residual functional capacity in order to conclude that the applicant's impairment was not severe enough to satisfy the regulatory standards under step two. The court determined that step two and step five of the sequential analysis may not be compressed and that residual functional capacity findings are irrelevant to the step two inquiry. Id. at 1032. The court then refused to evaluate the administrative record to determine whether the applicant should have or could have been refused at step two (although it made note of the mild burden faced by applicants generally at step two, thereby implicitly suggesting that the ALJ's step two determination of no disability was in error) and remanded the case to the Secretary for further proceedings. It is noteworthy that the ALJ in that case apparently reached conclusions about the claimant's physical exertional capacity without an assessment of her residual functional capacity by a physician.
[4] Thus, unlike McDaniel, see n. 3, where the court remanded the case because the ALJ ended the analysis at step two while simultaneously making step five findings, in Porter, the ALJ had made step five findings while stating that its evaluation had ended at step four.