Edward **BROWN**, Plaintiff,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES**, Defendant.

Civ. A. No. 88–0005–F.

United States District Court,
D. Massachusetts.

June 26, 1990.

Louis Kerlinsky, Springfield, Mass., for plaintiff.

Nancy B. Salafia, Sp. Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I. INTRODUCTION

This case is before the Court pursuant to section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), which provides for judicial review of any final decision by the Secretary of Health and Human Services ("the Secretary") with regard to an individual's entitlement to benefits. In March 1984, plaintiff Edward Brown filed for disability insurance benefits and period of disability insurance benefits under the Act. The application was denied, and the plaintiff appeared at a hearing conducted by an Administrative Law Judge ("ALJ"), who determined in June 1985 that the plaintiff was not disabled. In September 1985, the Secretary's Appeals Council issued an order which rescinded the ALJ's determination, and ordered that a new initial determi-

nation be made in light of new regulations dealing with mental impairments.

Upon reconsideration, the ALJ held another hearing during which the plaintiff testified to his continuing disability. In September 1987, the ALJ again determined that the plaintiff was not disabled. The plaintiff requested that the Appeals Council review the ALJ's decision, and submitted additional evidence regarding his mental impairment. After reviewing the additional evidence, the Appeals Council approved the ALJ's decision in December 1987, making it the final decision of the Secretary.

In January 1988, the plaintiff filed a complaint in this Court, alleging that the Secretary's decision was not supported by substantial evidence. In June 1988, the Secretary filed an answer to the plaintiff's complaint alleging that the Secretary's administrative decision is supported by substantial evidence, and seeking dismissal of the plaintiff's complaint.

The plaintiff then filed a motion for judgment on the pleadings in August 1989. The Secretary responded with a motion for an order affirming the decision of the Secretary and an accompanying memorandum in September 1989. Also in September 1989, the plaintiff filed a memorandum in opposition thereto.

## II. FACTS

### A. Plaintiff's Testimony

The plaintiff graduated from high school, served in the United States Navy for four years, and graduated from a two-year technical college course which specialized in air conditioning and refrigeration. Administrative Record ("A.R.") at 39. He stated that he worked as a plumber until 1980, and has been unable to obtain a new job due to back pain. A.R. at 40. During the 1985 hearing, the plaintiff gave a detailed description of his pain, stating that it is constant in his back and right leg. A.R. at 41. During the 1987 hearing, the plaintiff stated that the lower back pain extended "mostly in my left leg." A.R. at 89.

The plaintiff stated that because of the pain, he needed the help of a neighbor in order to wash his dishes and laundry. A.R. at 106. Yet, he acknowledged that he had helped relatives in New York move furniture and install linoleum in 1986. A.R. at 100, 353. He rejected the opportunity to work in a sheltered setting with Goodwill Industries, stating that "[i]t looked like everything there [was] for retarded people so I didn't do it. I didn't see anything there that I liked." A.R. at 48.

The plaintiff testified during hearings that he was able to drive an automobile, A.R. at 38 and 97, that he drives to weekly therapy sessions, A.R. at 65, and that he had driven himself to the administrative hearing. A.R. at 38. He stated that he had become involved in an accident in 1983 while "taking too much Elavil." A.R. at 55. In response to a question posed by the ALJ during the 1987 hearing, the plaintiff stated that "I don't really know" whether the medication interfered with driving. A.R. at 97.

The plaintiff's testimony regarding his emotional problems recounts two suicide attempts. A.R. at 45. Fortunately, the plaintiff was dissuaded in both instances and he did not suffer any physical harm. A.R. at 45–46. He was hospitalized at the Baystate Medical Center for the emotional illness. A.R. at 44. During the 1987 hearing he reported being treated monthly by a psychiatrist, Dr. Honeyman, and weekly by a psychologist, Judith Stone, A.R. at 103, and that he participated in weekly group therapy sessions. A.R. at 104.

### B. Medical Evidence

In August 1983, the plaintiff complained of back pain caused by injuries attributed to an accident which occurred while he was riding in a taxicab. X-rays found no acute injury; however, anti-arthritic medication was prescribed for what was diagnosed as exacerbation of pre-existing muscle and ligament sprains. A CAT scan found no evidence of disc rupture. A.R. at 167, 196 (letters of Drs. Linson and Lynn). Dr. Lynn recommended the plaintiff "be as physically active as possible." A.R. at 170.

The plaintiff was admitted to Baystate Medical Center in September 1983 for treatment of "increased depression and suicidal thoughts." The plaintiff was distressed by back pain, marital and financial problems, and he stated that his father had committed suicide at the age of forty-three. Although still depressed upon discharge, the plaintiff was found to be "obese, alert, generally cooperative, fully oriented without psychotic or acute suicidal ideation." A.R. at 169. Psychological testing indicated "somatic symptoms" and a "tendency to develop physical symptoms under stress," with a "moderate risk for suicide." A.R. at 171–72 (report of Elizabeth Hess, Ph.D.).

Following his release from the hospital, the plaintiff began participating in the treatment program offered by the Community Care Center in Springfield. Although he appeared depressed during his intake interview in October 1983, the plaintiff was described as appropriately dressed and groomed, and cooperative, with no hallucinations or suicidal thoughts. The plaintiff was "not considered disabled and is in fact able to take care of himself." A.R. at 177 (report of Paul D. Shore–Suslowitz, Ed. D.).

A psychiatrist's reports of therapy sessions conducted between October 1983 and October 1984 indicate that plaintiff's emotional state was more stable although sometimes depressed, with only occasional "fleeting periods of suicidal ideation." A.R. at 185–95 (reports of D. Honeyman, M.D.). A regimen of anti-depressant drugs was prescribed. Dr. Honeyman continued to prescribe anti-depressant drugs during the period running from September 1986 through October 1986, A.R. at 371–74, when the plaintiff was described as "goal directed and relevant." A.R. at 374.

In January 1984, the plaintiff was admitted to a pain management program at Providence Hospital. Muscle examinations revealed that the plaintiff had "very little" abnormality and "certainly ... no sciatica." The final diagnosis was chronic low back strain, and "it was clear that [the plaintiff's] chief problem was depression." A.R. at 197–98 (report of Dr. Brendler).

The plaintiff was hospitalized at the Baystate Medical Center for depression and "psychogenic back pain" during May and June 1984, following another suicide threat. "The major issue is his complaint of severe back pain and his fear that no one took him seriously and that there was no effective treatment." A.R. at 204 (report of Dr. van Bavel).

In an evaluation completed in August 1984, the plaintiff's depression had "stabilized" after brief bouts of suicidal thinking. A therapist found the plaintiff was focussing on back pain "as a way to avoid any other current difficulties he was having in his life, e.g. divorce." A.R. at 183–84 (report of Linda Rivard, LSWA). With regard to his back pain, the plaintiff had "made no attempt to follow any suggestion to lose weight or exercise appropriately," and he believed the psychological treatment "program was a way to provide structure in his life and that was all." *Id.* "Little progress was made" in the area of obtaining a "vocation outlet" for the plaintiff. *Id.* at 183.

An examination of the plaintiff in October 1984 found no serious abnormalities and ruled out spine disease. A.R. at 208–11 (report of Dr. Fink). In discussing the plaintiff's back pain, the physician found it interesting that the plaintiff's "best pain relief was on Elavil, and his recent exacerbation has occurred subsequent to the change to another anti-depressant medication. It is very likely that depression, which is quite active in this man at the present time, is exacerbating his chronic lumbar and cervical pain." A.R. at 210.

The plaintiff was again hospitalized for depression at the Baystate Medical Center on two occasions during April, May and June 1985. Electroshock therapy was attempted, but discontinued due to the plaintiff's weight. A.R. at 349. A discharge summary repeated the previous diagnoses of depression, obesity and "chronic back pain of unknown etiology." A.R. at 346 (report of Dr. Jaffe). The plaintiff's "characteristic style of passivity and withdrawal" was also noted. *Id.*

A physical examination conducted in March 1986 found no "musculoskeletal or neurological abnormalities which might be related to the patient's back pain." A.R. at 359 (report of Dr. Schiff). The plaintiff was found to be suffering from a "severe psychiatric disease." *Id.* A radiological examination revealed unremarkable lumbosacral spine arthritis in the cervical spine. A.R. at 360. The cervical spine arthritis was described as "not currently limiting" and perhaps related to "patient's prior complaint of neck pain[—]with radiation to the right shoulder." A.R. at 359 (report of Dr. Schiff).

In April 1986, Robert Gillespie, a psychologist at the Community Care Mental Health Center completed a questionnaire at the request of the Massachusetts Disability Determination Services. A.R. at 361–67. Dr. Gillespie stated that the plaintiff's interpersonal relationships "are to some extent impaired by his depression and underlying personality disorder." A.R. at 362. Nonetheless, the plaintiff's concentration, memory and ability to travel in public were described as normal. In response to the question of whether the plaintiff was unable to function "outside of a highly structured living and/or day treatment setting for 2 or more years," Dr. Gillespie responded "yes—for his entire life." The plaintiff has questioned the ambiguity of this response.

The record also includes letters to the plaintiff's attorney which were reviewed by the Appeals Council. In January 1985, Dr. Lynn wrote that the plaintiff "is totally disabled." A.R. at 225–26. In August 1985, Dr. Jaffe summarized the plaintiff's hospitalizations and concluded that "his depression prevents him from holding a job and is disabling." A.R. at 345. Dr. Honeyman stated in his letter of August 1987 that he would continue to prescribe anti-depressant drugs for the plaintiff "into the foreseeable future" and that the plaintiff is disabled. A.R. at 382. Dr. Honeyman also wrote of the plaintiff's mood disorder, sleep disturbances, low energy level and difficulty motivating himself. A.R. at 386. A therapist, Judith Stone, wrote of the plaintiff's unhappy family background and stated that as the plaintiff's "attempts to get the system to recognize the validity of his physical disability are foiled he reacts with frustration, humiliation, depression and struggles against a will to take his own life, as his father exemplified." A.R. at 384–85.

### C. The ALJ's Decision

Upon reviewing the evidence of the plaintiff's physical pain which was confirmed by medical findings of degenerative disc disease, back strain and obesity, the ALJ concluded that the plaintiff was capable of working at the light exertional level. A.R. at 21–22. The ALJ acknowledged that the plaintiff's emotional problems presented a serious impairment. A.R. at 22. The ALJ prepared a Psychiatric Review Technique Form ("PRTF") which indicated that the plaintiff's emotional problems do not present a mental impairment of listing level severity. A.R. at 25–27. Based on the plaintiff's age, education and work experience, the plaintiff was found to have the residual functional capability needed to perform the full range of light work. A.R. at 23.

## III. DISCUSSION

### A. Standard of Review

■ This Court is bound to uphold the determination of the Secretary if it is supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *see also Lizotte v. Secretary of Health and Human Services*, 654 F.2d 127, 128 (1st Cir. 1981). At issue in the instant case is the Secretary's determination that the plaintiff's impairments did not render him disabled through September 30, 1986, when the plaintiff last met the earnings requirements of Title II of the Social Security Act.

### B. Plaintiff's Non Exertional Limitations Caused by Back Pain

The Social Security Administration regulations require the ALJ to follow a five-step analysis to determine whether an individual is disabled. This analysis is set out in *Goodermote v. Secretary of Health and Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). The first step is to determine whether the claimant is working or engaged in substantial gainful activity. In the instant case, the plaintiff was not working. The second step requires the plaintiff to prove a severe impairment "which significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). In the instant case, the ALJ acknowledged that the plaintiff suffered from "major depression in remission and mild degenerative joint disease of the lumbosacral spine with a secondary diagnosis of a dependent personality disorder." A.R. at 23. This finding indicates the plaintiff is suffering from a severe impairment.

The plaintiff is automatically found disabled if the plaintiff's impairment, or combination of impairments, is so severe that it satisfies the elements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter "Appendix 1"). *Goodermote, supra.* The ALJ determined that the plaintiff's impairments were not of listing level severity, rejecting the plaintiff's claim that his back pain renders him disabled.

Due to the nature of the plaintiff's alleged pain, the Court's review of the ALJ's determination must include the criteria contained in two sections listed in Appendix 1: section 1, dealing with the musculoskeletal system, and section 12, dealing with psychosomatic disorders.

■ First, under section one, subsections 1.02–1.05 of Appendix 1 list the level of severity required for disability caused by arthritis and spinal disorders. Medical evidence in the instant case does not indicate such a listing level disorder. In addition to the numerous radiological tests which show no serious abnormality, the examining physicians have reported that the plaintiff's range of motion is not limited by the alleged back pain.

■ Second, under the section 12 listing of mental disorders, subsection 12.07 explains the level of severity at which somatoform disorders are considered disabling. Somatoform disorders are "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." *Id.* The doctors who have worked with the plaintiff agree that his physical pain is mainly somatic in nature. Yet, the symptoms did not begin before age thirty, they did not disturb the plaintiff's vision, speech, hearing, use of a limb, or movement or control, nor did they create unrealistic interpretations of physical signs or sensations, as required by subsection 12.07 A. Additionally, there is substantial evidence to support the ALJ's determination recorded on the PRTF that the plaintiff is only slightly limited in daily living activities and social functioning. Under subsection 12.07 B, a marked difficulty is required for a disability finding. While there have been episodes of difficulty in work-like settings, and evidence that the plaintiff's concentration is affected, there is substantial evidence that the plaintiff's somatic symptoms do not render him incapable of coping with substantial gainful activity.

This case is similar to *Benda v. Bowen*, 684 F.Supp. 210, 211 (N.D.Ill.1988) (somatoform disorder was not disabling), in which the plaintiff was "relatively well groomed, does his own housecleaning, occasionally cooks for himself, and volunteers to do housekeeping chores for his neighbors." Despite the testimony by the plaintiff in the instant case that he is able to do housecleaning only with the help of a neighbor, the record evidence establishes that the plaintiff is able to drive, cook, and assist family members by moving furniture and installing linoleum. Therefore, substantial evidence supports the finding that the somatic pain which he reports is not a listing level impairment.

### C. Plaintiff's Depression: A Serious Mental Impairment

■ The plaintiff's depression must be examined as a potentially listing level im-

pairment. Section 12 of Appendix 1 gives a detailed analysis of mental disorders. The plaintiff's depression is properly considered under subsection 12.04, affective disorders. Affective disorders are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life." *Id.* While the plaintiff's consistently depressed mood has manifested the characteristics of such a disorder, these manifestations have not brought about the restrictions of a listing level severity.[1]

The plaintiff's depression is also properly considered under subsection 12.08, dealing with personality disorders. Personality disorders exist "when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress." *Id.* Again, the plaintiff does exhibit the required number of manifestations required for consideration of a personality disorder,[2] yet these manifestations do not restrict the plaintiff to the degree required by the criteria in subsection 12.08 B. *See* PRTF results for subsection 12.04 B, note 1, *supra.*

■ The Court finds the instant case is similar to the emotional problems facing the plaintiff in *Walker v. Secretary of Health and Human Services*, 884 F.2d 241 (6th Cir.1989). The *Walker* court found

---

**1.** Subsection 12.04 states that the required level of severity for an affective disorder is met when both A and B are satisfied:

A. Medically documented persistence, either continuous or intermittent, of one of the following [of which the ALJ found three, which were recorded on the ALJ's PRTF and which are indicated below by an "X"]:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance [X]; or

d. Psychomotor agitation or retardation; or

e. Decreased energy [X]; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thought of suicide [X]; or

i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized;

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living [ALJ found "slight" restrictions]; or

2. Marked difficulties in maintaining social functioning [ALJ found only "moderate" difficulties]; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere) [ALJ found "seldom"]; or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors) [ALJ found "repeated"].

20 C.F.R. Part 404, Subpart P, Appendix I, § 12.04.

**2.** Subsection 12.08 states that the level of severity for a personality disorder is met when the requirements in both A and B are satisfied:

A. Deeply ingrained, maladaptive patterns of behavior associated with one or more of the following [of which the ALJ found two, which are designated by an "X"]:

1. Seclusiveness or autistic thinking; or

2. Pathologically inappropriate suspiciousness or hostility; or

3. Oddities of thought, perception, speech and behavior; or

4. Persistent disturbances of mood or affect [X]; or

5. Pathological dependence, passivity, or aggressivity [X]; or

6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B. *See* note 1, *supra* (same criteria set out in subsection 12.04).

that the plaintiff's sanitarium discharge was substantial evidence to support a finding of no disability. The plaintiff in *Walker* suffered from mild depression and low self esteem, and his suicidal ideations had ceased. While the plaintiff in the instant case has suffered with major depression, the major symptoms were found to be in remission by the ALJ.

The plaintiff's treating psychiatrist, therapist and treating physician have written letters which disagree with the ALJ's characterization of the plaintiff's "B" criteria restrictions. Their view of these criteria led them to the conclusion that plaintiff is disabled. However, these conclusions conflict with statements in the Administrative Record, including their own reports, which encouraged the plaintiff to remain active, and indicated that the plaintiff is able to present himself in a socially acceptable manner. It is for the Secretary to resolve these conflicts, as well as the ambiguities in both the plaintiff's testimony and the questionnaire completed by Dr. Gillespie. This Court will not disturb the Secretary's decision that the plaintiff's emotional impairment is not automatically disabling, since it is supported by substantial evidence. *Rodriguez Pagan v. Secretary of Health and Human Services*, 819 F.2d 1, 3 (1st Cir.1987).

Experts who have studied how the Social Security system deals with individuals suffering from mental disorders have acknowledged that "the routine demands of work and social relations are major stresses" for such individuals. W. Richard Lamb, M.D., "Incentives and Disincentives of Disability Insurance for the Chronically Mentally Ill," in *Psychiatric Disability: Clinical, Legal, and Administrative Dimensions* 343, 346 (A. Meyerson, T. Fine eds.) (1987). Yet, low stress work in a protective setting promotes progress by the individual, since "[w]ork therapy is rec-

ognized as being fully as important as talking therapy. Having no reason to get up in the morning and no structured day to look forward to causes profound feelings of emptiness." *Id.* at 346. Unfortunately in the instant case, the plaintiff has chosen to use "talking therapy" programs to provide structure in his daily life, *see* report of Linda Rivard, *supra*, and he has declined to accept the advice of the doctors and therapists who have recognized his capabilities and have encouraged him to obtain low stress employment.

*D. Plaintiff's Residual Functional Capacity*

Having determined that the plaintiff's pain and emotional problems are not of the listing level, the ALJ proceeded to the fourth and fifth steps, as set out in *Goodermote, supra.* It was clear that the plaintiff could not return to his past work as a plumber. However, the ALJ determined that the plaintiff was not prevented from "performing other work of the sort found in the economy." *Goodermote*, 690 F.2d at 7. Specifically, the plaintiff was found to be capable of performing work at the light level of exertion.

Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and can require "a good deal of walking or standing" and "pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b) and 416.967(b). The record does support the conclusion that the plaintiff is capable of working at this level.

However, the Secretary has the burden of showing that jobs are available to the plaintiff at this level of exertion. To satisfy this burden, "[t]he Secretary has promulgated a set of medical-vocational guidelines (the Grid) ... to simplify the application of the fifth test." *Goodermote*, 690 F.2d at 7.[3] The ALJ assessed the plain-

**3.** In affirming the Secretary's use of the medical-vocational guidelines, the Supreme Court explained that:

[p]rior to 1978, the Secretary relied on vocational experts to establish the existence of suitable jobs in the national economy. After a claimant's limitations and abilities had been

determined at a hearing, a vocational expert ordinarily would testify whether work existed that the claimant could perform. Although this testimony was based on standardized guides ... vocational experts frequently were criticized for their inconsistent treatment of similarly situated claimants.... To improve

tiff's residual functional capacity, using the Residual Functional Capacity "Grid" for Light Work, set out at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. The ALJ determined that as a younger individual, with a high school education, two years of college and non-transferrable skills from past employment, the plaintiff fit within Rule 202.-21 of the Grid, and therefore the plaintiff was not disabled.

■ When an individual suffers from a nonexertional impairment such as pain, full consideration must be given to all the relevant facts, and the Grid may be used only as "a framework for consideration of how much the individual's work capability is further diminished" by the nonexertional limitations. 20 C.F.R. Pt. 404, Subpart P, Appendix 2, Rule 200.00(e)(2). In such a case, "the ALJ may not mechanically apply the rules contained in the Grid." *DaRosa v. Secretary*, 803 F.2d 24, 26 (1st Cir.1986), *citing Sherwin v. Secretary of Health and Human Services*, 685 F.2d 1, 4 (1st Cir. 1982). In the instant case, the record shows that the ALJ did consider all the medical evidence and the plaintiff's own testimony regarding his daily routine and residual capacity. The medical-vocational guidelines were used as a framework for determining the plaintiff's residual functional capacity. A lack of clinical evidence regarding the plaintiff's back pain was one of the several factors considered by the ALJ in evaluating the evidence. The finding that the plaintiff was not disabled by pain is supported by substantial evidence.

■ When the degree of pain alleged by the claimant significantly conflicts with the medical findings, the ALJ must obtain " 'detailed descriptions of daily activities by directing specific inquiries about the pain and its effect to the claimant, his/her physicians from whom medical evidence is being requested, and other third parties who would be likely to have such knowledge.' " *Avery v. Secretary of Health and Human Services*, 797 F.2d 19, 23 (1st Cir.1986),

*quoting* the Secretary's Program Operations Manual System ("POMS"), DI T00401.570. The ALJ did engage in such an inquiry. The medical record also contained discussions of the plaintiff's pain symptoms, enabling the ALJ to determine that the plaintiff had reported varying symptoms to numerous doctors who were unable to ascertain the cause for the level of pain complained of by the plaintiff.

■ This Court must defer to the credibility determination made by an ALJ who has heard testimony from the plaintiff while observing the demeanor of the plaintiff, and has balanced the testimony with other evidence. *Frustaglia v. Secretary of Health and Human Services*, 829 F.2d 192, 195 (1st Cir.1987), *citing DaRosa v. Secretary of Health and Human Services*, 803 F.2d at 26. While the ALJ may not disregard the plaintiff's complaints of pain simply because they are not corroborated by medical evidence, *DaRosa v. Secretary*, 803 F.2d at 25–26, the plaintiff's own testimony describing the pain is not conclusive evidence of disability. 42 U.S.C. § 423(d)(5)(A); *Bianchi v. Secretary of Health and Human Services*, 764 F.2d 44, 45 (1st Cir.1985) (plaintiff's self-serving allegations alone will not suffice for a finding of disability). In this case, substantial evidence supports the ALJ's finding that the plaintiff's pain, when viewed in the context of a musculoskeletal disorder, does not prevent the plaintiff from engaging in light work.

Yet, the record is not complete as to the ALJ's finding that the combination of a somatoform disorder and a severe emotional impairment would not foreclose the plaintiff from the broad range of jobs in the light level of exertion. The First Circuit Court of Appeals has stated that:

[e]ven if most individuals would not find it particularly stressful to do the jobs listed in the ALJ's decision, we have no evidence showing that [plaintiff], who suffers from severe mental impairment,

both the uniformity and efficiency of this determination, the Secretary promulgated medical-vocational guidelines as part of the 1978 regulations.

*Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).

would react the same way.... The Secretary himself has recognized the need to examine an individual's specific vocational abilities when mental impairments are at issue....

*Lancellotta v. Secretary of Health and Human Services*, 806 F.2d 284, 285 (1st Cir.1986) (remanding case of claimant suffering from physical and emotional impairments).

When reviewing the case of a person with a mental impairment, an ALJ's finding of no disability must be supported by substantial evidence that:

> the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education or work experience will not offset such a severely limited occupational base.

*Id.* at 286, *quoting* Social Security Ruling 85–16. Therefore, the instant case must be remanded to the Secretary for further assessment of the plaintiff's vocational capabilities in light of his emotional impairment and the availability of low stress jobs which the plaintiff could perform.

### IV. CONCLUSION

Accordingly, the plaintiff's motion for judgment on the pleadings and the Secretary's motion for an order affirming the decision of the Secretary are DENIED. The case is REMANDED to the Secretary for further proceedings.

It is So Ordered.