**Madeline TORRES, Plaintiff**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant**

**No. CIV.A.02–30051.**

United States District Court, D. Massachusetts.

Dec. 10, 2002.

---

David Engle, Northampton, MA, for Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

***ORDER REGARDING REPORT AND RECOMMENDATION WITH RE-GARD TO PLAINTIFF'S MOTION TO REVERSE OR REMAND AND DEFENDANT'S MOTION TO AF-FIRM THE DECISION OF THE COMMISSIONER***

**(Docket Nos. 10 and 13)**

PONSOR, District Judge.

Upon *de novo* review, the Report and Recommendation of Magistrate Judge Kenneth P. Neiman dated November 19, 2002 is hereby adopted, without objection. The defendant's Motion (Docket No. 13) is DENIED, and plaintiff's motion (Docket No. 10) is ALLOWED, to the extent it seeks a remand. The clerk will enter judgment for plaintiff.

It is So Ordered.

REPORT AND RECOMMENDATION WITH REGARD TO PLAINTIFF'S MOTION TO REVERSE OR RE-MAND and DEFENDANT'S MO-TION TO AFFIRM THE DECISION OF THE COMMISSIONER (Docket Nos. 10 and 13)

NEIMAN, United States Magistrate Judge.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. § 405(g). Madeline Torres ("Plaintiff") alleges that the Commissioner's decision denying her Supplemental Security Income ("SSI") disability benefits—which is memorialized in an August 9, 2001 decision by an administrative law judge—is not supported by substantial evidence. Plaintiff has moved to reverse or remand the decision and the Commissioner, in turn, has moved to affirm the decision.

The parties' cross motions have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the court will recommend that Plaintiff's motion, to the extent it seeks a remand, be allowed and that the Commissioner's motion to affirm be denied.

I. STANDARD OF REVIEW

The Commissioner's factual findings in making her disability determination are

conclusive so long as they are grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is "more than a mere scintilla." *Id.* Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

█ Even so, a denial of disability benefits need not be upheld if there has been an error of fact or law in the evaluation of the particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter ... a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand[ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. BACKGROUND

Plaintiff was born on August 28, 1960, is from Puerto Rico, has an eighth grade education and does not speak English. (Administrative Record ("A.R.") at 74, 81 and 238.) Her work history appears to consist of a few periods of seasonal, unskilled work on tobacco farms prior to 1998. (A.R. at 30, 76 and 89.) Although she resides alone in Springfield, a friend assists her with bathing, dressing, shopping, housecleaning, transportation and meal preparation. (A.R. at 96–100.)

## A. MEDICAL HISTORY

Plaintiff's alleged disability purportedly commenced on February 1, 1997, and stems mainly from injuries to her left ankle and a mental impairment, i.e., severe depression and related issues. (A.R. at 23, 71–83 and 217.) Plaintiff also claims to experience memory and hearing loss and to be unable to stand for long periods of time. (A.R. at 101–06.)

### 1. Ankle Injuries

Plaintiff injured her left ankle in January of 1998. (A.R. at 167.) While details of initial follow-up care are not included in the record, Plaintiff was monitored by Dr. Morton Lynn, a surgeon at the Baystate Medical Center ("Baystate") in Springfield, from March of 1998 through April of 1999. (*Id.*) During those months, Plaintiff had x-rays and bone scans which showed a "complex ... injury" that was "progressive in nature" and a CT scan which suggested "an osteochondral injury or osteochondritis d[i]ss[e]cans." (*Id.*) [1]

On April 16, 1999, after physical therapy and other conservative measures proved unavailing to ease Plaintiff's pain, she underwent arthroscopic surgery. (A.R. at 167–70.) Dr. Lynn performed this surgery at Baystate. (*Id.*)

Unfortunately, on November 14, 1999, Plaintiff re-injured her ankle after falling down some stairs. (A.R. at 175.) She was again admitted to Baystate—this time by Dr. Paul Koerner, an orthopedic surgeon—and x-rays revealed a displaced fracture and an unstable ankle mortise. (A.R. at 171–78.) As a result, Dr. Koerner

---

1. "Osteochondritis dissecans" is an "inflammation of both bone and cartilage" which results "in the splitting of pieces of cartilage into the joint." *The Slone–Dorland Annotated Medical–Legal Dictionary* at 516 (1987 and 1992 Supp.).

performed a second surgery; he reduced the fracture and reinforced the damaged bone with a lag screw and tubular plate. (*Id.*)

During a follow-up visit on March 17, 2000, Dr. Koerner noted that Plaintiff was still experiencing "considerable pain" and, accordingly, prescribed continued physical therapy and a "fracture walker" for support. (A.R. at 203.) Then, in May of 2001, Bernice Ezell, a nurse practitioner with the Brightwood Health Center ("Brightwood"), reported that Plaintiff had again injured her left ankle and that it was so swollen it could not be flexed or extended. (A.R. at 285.)

### 2. Mental Issues

Immediately following her second ankle surgery, Dr. Koerner referred Plaintiff to Baystate's psychiatric department. (A.R. at 179.) There, Plaintiff reported that she had been feeling more depressed and occasionally suicidal ever since her mother's death on July 11, 1998. (A.R. at 179–80.) A consultation report dated November 15, 1999, concluded that Plaintiff was suffering from major depression and recommended in-patient hospitalization. (A.R. at 180.)

Between November 15 and November 22, 1999, Dr. Harold Jordan, a psychiatrist, treated Plaintiff with several medications, in part, to reduce Plaintiff's intrusive thoughts and ruminative thinking. (A.R. at 212–14.) On November 22, Plaintiff was discharged with a diagnosis of major depressive disorder. (A.R. at 213.) She was referred to the Gandara Mental Health Center ("Gandara") for a December 3, 1999 appointment. (*Id.*) She was also instructed to minimize use of her surgically-repaired left ankle and to elevate it frequently. (A.R. at 212–14).

Gandara's Natalie Hall, M.S., completed a clinical assessment of Plaintiff on December 3, 1999. (A.R. at 217–22.) Noting

that Plaintiff had used alcohol, marijuana and cocaine within the last few months, Hall suggested a diagnosis of polysubstance dependence. (A.R. at 221.) Hall also reported Plaintiff's claimed suicidal thoughts, visual and auditory hallucinations and concentration problems and opined that major depression needed to be considered or ruled out. (A.R. at 217–22.) In addition, Hall described Plaintiff as having sleep difficulties and, along with her ankle condition, other physical impairments such as asthma, arthritis and migraine headaches. (A.R. at 220–21.)

Within a week of Hall's assessment, Plaintiff commenced regular out-patient psychiatric treatment at Gandara. (A.R. at 223–27, 270–80 and 282.) Her psychotropic medications were prescribed and monitored by Dr. Morris Pardo, a psychiatrist, and she participated in psychotherapy with Roberto Christian, a psychologist. (See *id.*) The clinical reports detailing this treatment span December 9, 1999, to February 20, 2001. (See *id.*)

Meanwhile, in March of 2000, Plaintiff underwent a battery of tests administered by Drs. Carlos Varela and W. Sydney Stern, both psychologists. (A.R. at 238–41.) In those tests, Plaintiff reported suicidal ideation, crying spells and a disturbed mood; she also said that she "sees" her deceased mother, has problems with sleeping and appetite and, despite completing a substance abuse program, was still using cannabis and drinking regularly. (A.R. at 238.) And although Plaintiff's attention and memory were deficient, she appeared oriented, showed no signs of delusions or hallucinations and exhibited no evidence of an organic mental impairment. (A.R. at 238–40.)

Intelligence quotient ("IQ") testing by Drs. Varela and Stern yielded a "borderline" verbal score for Plaintiff of seventy-

one and a "lower ... average" performance score of ninety—both of which were considered "likely overestimations." (A.R. 239–40.) Plaintiff's "full scale" IQ score was seventy-nine. (*Id.*) While Plaintiff did best on tasks that involved nonverbal concept formation, she performed poorly on tasks that measured general factual knowledge, attention, computational skills and vocabulary. (A.R. at 239.)

As a result of the battery of tests, Drs. Varela and Stern opined that sudden or prolonged stress could affect Plaintiff's ability to function, that her mother's death caused her a significant measure of depression and that she possibly had "moments of psychosis." (A.R. at 240.) They did not, however, believe that the testing indicated actual psychosis. (*Id.*)

In April of 2001, Christian, Plaintiff's psychologist, reported that Plaintiff's mental status had improved in recent months, but that she still had very poor memory, was highly distracted and had a short attention span. (A.R. at 282.) Christian also stated that Plaintiff's ability to relate to others was markedly impaired as a result of many interpersonal problems and conflicts, mood swings and crying spells. (*Id.*) In this vein, Plaintiff told Christian that she was sometimes "so depressed she [did not] want to get out of bed" and that her medications made her drowsy. (A.R. at 283.) Christian also reported that Plaintiff had a speech problem, even in Spanish, and ultimately opined that she lacked "the internal resources and external skills to sustain a job." (*Id.*)

Finally, in a report dated May 3, 2001, Ezell, the Brightwood nurse practitioner, reported that Plaintiff had been seen for a number of medical problems: migraine headaches, joint pains, asthma and routine health maintenance. (A.R. at 305.) Ezell also noted that Plaintiff was treated for depression by Dr. Pardo at Gandara, to whom Ezell deferred for a mental assessment. (*Id.*) Ezell opined that Plaintiff "could not be gainfully employed in light of her combination of [physical and mental] health problems." (*Id.*)[2]

2. Plaintiff has had many other contacts with the medical community. For example, in March of 1999, Plaintiff complained of heart palpitations and left-arm cramping. (A.R. at 132.) Tests were scheduled, but do not seem to have taken place. (See A.R. at 134–35.) When Plaintiff voiced similar complaints in June of 1999, a stress echocardiogram was attempted but was unsuccessful and a chest x-ray showed nothing acute. (A.R. at 135–36, 186.) In August of 1999, Plaintiff fell and was treated for back and shoulder pain, (A.R. at 197), and in September of 1999, she was treated for abdominal pain due to pelvic inflammatory disease, (A.R. at 138–39). In October of 1999, Plaintiff reported that she had suffered from a three week-long headache and neck pain after being "punched lightly" in the back of her head by her boyfriend that August; she said her symptoms cleared for a while but returned. (A.R. at 140–41.) In November of 1999, Plaintiff went to the emergency room complaining of body pain and arm stiffness. (A.R. at 141.) In August of 2000, Plaintiff told staff at Baystate that she had been experiencing a headache for three days and had pain in her kidneys. (A.R. at 265.) She was told she needed to quit smoking in order to control her asthma and was given a new headache medication. (*Id.*) On examination, it appeared that her complaint of kidney pain was likely musculoskeletal in nature. (*Id.*) She was also advised that she needed to lose weight. (A.R. at 266.) In October of 2000, Plaintiff reported that pain in her right shoulder and neck had existed for two weeks. (A.R. at 267.) In February of 2001, Plaintiff was again seen at Baystate, this time complaining of rectal bleeding and joint pain. (A.R. at 286, 288.) In March of 2001, she reported chest and neck pain, accompanied with chills and cold sweats. (A.R. at 287.) An examination showed no signs of lung or heart problems, but did show tenderness in her neck and chest muscles. (A.R. at 284.) Steroids were prescribed for her asthma and she was told to return in one week if her symptoms did not improve. (*Id.*). Plaintiff returned in April complaining of a head-

B. *PROCEDURAL HISTORY*

On November 30, 1999, in the midst of these medical benchmarks, Plaintiff applied for SSI disability benefits. (A.R. at 71–73.) On January 17, 2000, the Commissioner denied the application and, on March 8, 2000, Plaintiff requested reconsideration. (A.R. at 38–50.)

In April of 2000, during the reconsideration process, Dr. Alex Ursprung, a reviewing psychologist for the Disability Determination Service ("DDS"), diagnosed Plaintiff with severe depression and affective mood and substance-abuse disorders. (See A.R. at 242–46 and 253–61.) Dr. Ursprung indicated that Plaintiff's depression was characterized, among other things, by "anhedonia"—"the pervasive loss of interest in almost all activities"—appetite problems, sleep disturbances, concentration difficulties, hallucinations and delusions. (A.R. at 256.) He opined that Plaintiff was moderately limited in her ability to (1) complete a normal workday and workweek, without some interruption due to psychological symptoms, and (2) interact with supervisors. (A.R. at 244.) Nonetheless, Dr. Ursprung concluded that Plaintiff remained able to perform "routine repetitive tasks" that did not require sustained attention or concentration. (A.R. at 246.)

In May of 2000, Dr. Jorge Baez–Garcia, a DDS reviewing physician, also assessed Plaintiff's residual functional physical capacity. (A.R. at 247–52.) He opined that, for three to four months while her ankle healed, Plaintiff should limit herself to work that does not involve prolonged standing or more than twenty-five to fifty pounds of frequent lifting. (A.R. at 248–49.) Dr. Baez–Garcia concluded, however, that Plaintiff would ultimately have little in

ache, although an examination showed no

the way of residual limitations. (A.R. at 249.)

On June 19, 2000, the Commissioner denied Plaintiff's request for reconsideration. (A.R. at 47–50.) Soon thereafter, Plaintiff sought a hearing before an administrative law judge. (A.R. at 51.) That request was granted and Plaintiff's hearing was held on April 17, 2001. (A.R. at 20–37.) Both Plaintiff and a vocational expert testified at the hearing. (*Id.*)

In a written decision dated August 9, 2001, the administrative law judge ("ALJ") concluded that Plaintiff was not disabled and denied her application. (A.R. at 10–19.) In essence, the ALJ determined that Plaintiff had several impairments which were "severe," that she was unable to perform past relevant work and that she had no transferable skills, but decided that her allegations were "not totally credible." (A.R. at 18.) In the end, the ALJ concluded that Plaintiff had the residual functional capacity to perform certain "sedentary jobs," i.e., "unskilled work that does not involve close supervision or review." (*Id.* at 17 and 18.)

On October 3, 2001, Plaintiff requested the Appeals Council to review the ALJ's decision. (A.R. at 7.) On February 1, 2002, the Appeals Council denied the request (A.R. at 5–6), thereby making the ALJ's decision the final decision of the Commissioner. Plaintiff filed the present action on March 26, 2002, and, in due course, the parties filed the motions currently at issue.

III. *DISCUSSION*

An individual is entitled to SSI benefits if, among other things, she is needy and disabled. *See* 42 U.S.C. §§ 1381a and 1382c(a)(3). Plaintiff's financial need is not challenged. The question here is whether Plaintiff suffers from a disability.

focal neurological deficits. (A.R. at 285.)

## A. DISABILITY STANDARD AND ALJ'S DECISION

The Social Security Act (the "Act") defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual is considered disabled under the Act "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). *See generally Bowen v. Yuckert*, 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In determining disability, the Commissioner follows a familiar five-step protocol. The First Circuit has described the mandatory sequential inquiry as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimants physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

.    .    .    .    .

> Fourth, .... does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these five questions: that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability (question one); that Plaintiff's "left ankle fracture" and "affective disorder" were "severe" impairments, although not severe enough to be listed in Appendix 1 (questions two and three); that Plaintiff was unable to perform any of her past relevant work, i.e., jobs "performed at the heavy exertional level" (question four); and that while Plaintiff was unable "to perform the full range of medium work," she was able to perform certain "sedentary jobs" in the national economy, i.e., "unskilled work that does not involve close supervision or review" (question five). (A.R. at 15 and 18.) As a result, the ALJ concluded that Plaintiff does not suffer from a "disability."

## B. ANALYSIS OF PLAINTIFF'S CHALLENGE TO ALJ'S DECISION

Plaintiff challenges the ALJ's decision in a number of ways. She contends that the ALJ's factual findings with respect to her cognitive deficits, credibility and physical limitations were not based upon substantial evidence. She also asserts that the ALJ committed errors of law; in particular, she claims that he failed to fully evaluate her cognitive impairments and assertions of pain. In response, the Com-

missioner argues that the ALJ's factual findings are supported by substantial evidence and that the record also provides ample support for the ALJ's evaluation of Plaintiff's residual functional capacity and for his determination that Plaintiff's claims of greater limitations were not credible.

The court believes that, overall, Plaintiff has the better argument. In the court's view, the ALJ's analysis suffers from at least four deficiencies: it (1) essentially ignores the record evidence of Plaintiff's cognitive impairments; (2) understates Plaintiff's physical limitations; (3) improperly assesses Plaintiff's subjective complaints of pain; and (4) inadequately assesses Plaintiff's non-exertional limitations.

### 1. Cognitive Impairments

As indicated, the ALJ found that Plaintiff's only "severe" impairments were her "left ankle fracture" and her "affective disorder." As Plaintiff asserts, however, this finding ignores the substantial evidence of record that she also has profound cognitive impairments which preclude her from working in the national economy.

The record contains a number of examples of Plaintiff's cognitive impairments. Although Plaintiff has lived in the United States for many years, she cannot speak English and has difficulty even with her native Spanish. (A.R. at 283.) Her psychologist, Christian, described distractibility and memory impairments so severe that "[t]here have been incidents of fire in her kitchen because she forgets things on the stove." (A.R. at 282.) Ezell's comprehensive clinical assessment similarly found Plaintiff to be limited by abnormal memory and thought process. (See A.R. at 220.)

And, as described, formal tests by Drs. Varela and Stern document Plaintiff's borderline intelligence, delayed attention span, and auditory and visual memory impairments. (A.R. at 238–41.)

In the court's view, Plaintiff's cognitive limitations are hardly de minimis. Rather, the ALJ should have viewed these impairments—particularly when combined with Plaintiff's mental and physical limitations—as "severe." *See McDonald v. Sec'y of Health & Human Services*, 795 F.2d 1118, 1124–25 (1st Cir.1986) (impairment should be considered "severe" unless it has only a de minimis impact on claimant's ability to perform work-related activities).

To be sure, as the Commissioner argues, the ALJ "noted" the Varela–Stern examinations and test results. But, in the court's view, the ALJ's notation, (see A.R. at 15–16), hardly amounts to an adequate consideration of the effects of Plaintiff's cognitive limitations. In particular, the ALJ failed to square the Varela–Stern findings with similar information produced by Ezell and Christian which the ALJ found "not acceptable." (A.R. at 16.) Moreover, the ALJ failed to observe that Plaintiff performed poorly on the tests administered by Drs. Varela and Stern which measured general factual knowledge, attention, computational skills and vocabulary. (A.R. at 239.)

Further, and perhaps more importantly, the ALJ's abbreviated colloquy with the vocational expert did not adequately incorporate Plaintiff's cognitive impairments. The ALJ asked the vocational expert to assume only one hypothetical.[3]

---

**3.** The ALJ's hypothetical question to the vocational expert was phrased as follows:

I would like you to assume you're dealing with someone such as Ms. Torres, who's 40 years old with an eighth [grade] education and speaks only Spanish. I'd like you to assume she has work experience of the sort you just described[, i.e., past work as a tobacco farmer]. I'd like you to assume she has no, that she can occasionally lift objects

Nowhere does that hypothetical reflect the cognitive limitations described by Drs. Varela and Stein except perhaps in the idea that the hypothetical claimant could only perform work "that can be easily learned." This, in the court's estimation, was inadequate in light of the entire record. Accordingly, the court believes that the matter should be remanded to the ALJ for further evaluation of Plaintiff's cognitive impairments.

### 2. *Physical Limitations*

The ALJ's description of Plaintiff's physical limitations is somewhat more developed. Even so, it appears that the ALJ also understated the extent of Plaintiff's physical injuries.

The ALJ described Plaintiff's main physical problem simply as "a left ankle fracture." (A.R. at 15.) He failed to note important pre-fracture information. For example, Plaintiff began seeing a surgeon about her ankle as early as March of 1998, twenty months prior to her fracture; during that time, her ankle problems were described as "complex"; initial conservative treatment methods were uniformly unavailing; and by April of 1999, still seven months prior to her fracture, she had osteochondritis dissecans that became so debilitating as to necessitate arthroscopic surgery. The ALJ also neglected to point out that the fracture surgery itself was far from normal; it involved reinforcement of the damaged bone with a lag screw and tubular plate. Nor did the ALJ mention

that in March of 2000, Plaintiff still remained in considerable pain and required a walker to ambulate or that over one year later, in May of 2001, she re-injured her ankle. Indeed, the ALJ did not even mention any ankle problems in his hypothetical to the vocational expert. Further, the ALJ did not adequately take into consideration Plaintiff's claimed hearing and memory loss or her inability to stand for long periods of time.

■  In short, although the ALJ recognized some of the limitations placed on Plaintiff as a result of the ankle fracture, he failed to fully consider the extent of her ongoing, severe limitations exacerbated thereby or her other physical injuries. In doing so, the ALJ essentially ignored the regulatory observation that, even for "sedentary work" (the least active work on the Commissioner's scale), "a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a)(2002). This is further reason why the court believes a remand is in order.

### 3. *Subjective Complaints of Pain*

■  The court also believes that the ALJ failed to adequately evaluate Plaintiff's subjective complaints of pain. As the ALJ must know, subjective pain allegations are to be gauged in accord with legal standards established by the First Circuit

that weigh up to 50 pounds, frequently lift objects that weigh up to 25 pounds, but that she shouldn't have a job that involves prolonged standing and walking and by prolonged, I mean for more than 15 or 20 minutes at a time without the opportunity to sit. I'd like you to assume that she requires work that's done out of the direct sun, and work that doesn't expose her to more than ordinary levels of dust, fumes, gases and similar respiratory irritants, and

also requires work that doesn't involve prolonged exposure to hazards such as unprotected heights and unprotected machinery. Finally, I'd like you to assume that she is limited to unskilled work, as work that can be easily learned and work that's done relatively independently and doesn't involve close supervision or close review of her work.

(A.R. at 33–34.)

in *Avery v. Sec'y of Health & Human Services*, 797 F.2d 19, 27 (1st Cir.1986).

To be sure, the First Circuit has long acknowledged that an administrative law judge is not required to take a claimant's allegations of pain at face value. *See Bianchi v. Sec'y of Health & Human Services*, 764 F.2d 44, 45 (1st Cir.1985) (citing *Burgos Lopez v. Sec'y of Health & Human Services*, 747 F.2d 37, 40 (1st Cir.1984)). Moreover, it is well-established that the court must generally defer to credibility determinations made by an administrative law judge. *See Frustaglia v. Sec'y of Health & Human Services*, 829 F.2d 192, 195 (1st Cir.1987); *Brown v. Sec'y of Health & Human Services*, 740 F.Supp. 28, 36 (D.Mass.1990). Still, a court must review an administrative law judge's determination to see if it comports with the law.

The First Circuit in *Avery* established a road map for evaluating a claimant's subjective complaints of pain.[4] As the court observed, "[p]roper consideration of the effect of pain ... on an individual's ability to work is an important part of the disability evaluation process." *Id.*, 797 F.2d at 27 (quoting POMS T00401.570). The policy is grounded in the requirement that "there must be a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Id.* at 21. In essence, the administrative law judge must "obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to the claimant, his/her physicians from whom medical evidence is being requested, and other third parties who would be likely to have such knowledge." *Id.* at 23 (citations and internal quotation marks omitted). *Avery* then requires the administrative law judge to consider the following criteria: (1) the nature, location, onset, duration, frequency, radiation and intensity of pain; (2) any precipitating and aggravating factors; (3) the type, dosage, effectiveness and adverse side-effects of any pain medication; (4) any treatment, other than medication, for the relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *See id.* at 24–25 (citing POMS T00401.570); *Musto*, 135 F.Supp.2d at 227.

Here, in the court's opinion, the ALJ made little if any effort to analyze the required *Avery* factors, despite a record replete with references to Plaintiff's left ankle and other pain and the impact of such pain on her daily activities. (See, e.g., A.R. at 74–83, 96–112, 131–65 and 305.) Other than a passing reference to *Avery*, (see A.R. at 15), the ALJ appears to have simply rejected Plaintiff's testimony as incredible.

Of particular significance in this regard is the ALJ's failure to mention, let alone discuss, Plaintiff's medication regimen. At most, the ALJ may have recognized that Plaintiff's medications had adverse side-effects when he noted in the hypothetical posed to the vocational expert that Plaintiff should avoid "prolonged exposure to hazards such as unprotected heights and unprotected machinery." (A.R. at 34.) As a result, the ALJ virtually ignored the existence or efficacy of Plaintiff's medications in reducing her pain.[5]

---

4. Technically, the *Avery* court adopted the Commissioner's pain policy outlined in the Social Security Administration's Program Operations Manual System (POMS), DI T00401.570, a copy of which was appended to the court's opinion. *Id.* 797 F.2d at 24. The appended policy, *ibid.* at 27–30, has consistently been referred to as a part of the *Avery*

decision. *See, e.g., Musto v. Halter*, 135 F.Supp.2d 220, 226–27 (D.Mass.2001) (citing cases).

5. Nor does the ALJ's decision adequately explore the nature, location, onset, duration, frequency, radiation and intensity of pain; any precipitating and aggravating factors; or

■ In short, the ALJ failed to fully explore the *Avery* factors and, thereby, the overall effect of Plaintiff's limitations on her ability to engage in substantial gainful activity. As a result, the court cannot conclude that "a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." *Lizotte v. Sec'y of Health & Human Services*, 654 F.2d 127, 128 (1st Cir. 1981). This is yet another reason why the court believes that the matter should be remanded.

### 4. *Non–Exertional Limitations*

The ALJ's failure to properly analyze Plaintiff's subjective complaints of pain in accord with *Avery* may well have created a further error of law. As noted, an administrative law judge must proceed through a five step disability analysis. Where, as here, a claimant produces enough evidence to survive the first four steps, the burden shifts to the Commissioner to show, at step five, that there are jobs in the national economy that the claimant could perform. *See Goodermote*, 690 F.2d at 7. To accomplish this task, the Commissioner may turn to medical-vocational guidelines provided in the regulations—commonly referred to as the "Grid"—or rely on a vocational expert. *See Ortiz v. Sec'y of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). However, where, as here, a claimant has one or more non-exertional limitations, the Grid does "not accurately reflect what jobs would or would not be available." *Ortiz*, 890 F.2d at 524 (citation and internal quotation marks omitted). In oth-

er words, where non-exertional impairments significantly reduce the number of jobs a claimant can perform, the Commissioner usually meets his burden through the use of a vocational expert. *See id.* (citing cases).[6]

■ Here, the ALJ used both the Grid, as a framework, and a vocational expert. Citing the Grid, the ALJ found that Plaintiff's exertional limitations did not allow her to perform "heavy" work or even the full range of "medium" work. Nonetheless, in light of the testimony of the vocational expert, the ALJ concluded that there were a significant number of "sedentary" jobs in the national economy which she could perform. However, as indicated, the hypothetical essentially ignored Plaintiff's cognitive and ankle limitations. Equally significant, the ALJ made no mention of Plaintiff's non-exertional impairments in the hypothetical; having rejected Plaintiff's subjective complaints of pain, the ALJ did not question the vocational expert about the effect of Plaintiff's pain or her ability to perform any other work. This, in the court's view, is further error necessitating a remand. *See Podedworny v. Harris*, 745 F.2d 210, 218 (3rd Cir.1984) ("[T]he vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.") (citation omitted).

any treatment, other than medication, for the relief of pain. (See A.R. at 13–19.)

6. Granted, an administrative law judge does not have to call a vocational expert in every case where an individual exhibits non-exertional impairments. "If a non-strength impairment, even though considered significant, has the effect only of reducing that occupa-

tional base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability." *Id.* Still, "the more that occupational base is reduced by a nonexertional impairment, the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence." *Id.* at 524–25.

## IV. CONCLUSION

For the foregoing reasons, the court recommends as follows: that Defendant's motion to affirm the decision of the Commissioner be DENIED; that Plaintiff's motion, to the extent it seeks a remand, be ALLOWED, but otherwise DENIED; and that the matter be REMANDED for further hearing consistent with this opinion.[7]

November 19, 2002.

See, also, 2002 WL 31455257.

---

7. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.